IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 22, 2003 Session

## STATE OF TENNESSEE v. THOMAS DEE HUSKEY

**Appeal from the Criminal Court for Knox County**
**No. 51903     Richard R. Baumgartner, Judge**

---

**No. E2002-02317-CCA-R3-CD - Filed June 1, 2005**

---

The state has appealed the Knox County Criminal Court's suppression of statements made to police by the defendant, Thomas Dee Huskey, and of items found and seized from his home. The state contends that (1) the trial court erred as a matter of law in suppressing the statements and (2) the trial court erred in suppressing the items found at the home (a) because the police arrested the defendant in good faith reliance upon a capias which subsequently was declared void and (b) because the defendant's father consented to a search of the defendant's room. The defendant asserts that if the state's appeal is successful, then he contends that the trial court erred in prior rulings denying suppression of his statements and the items seized from his home on other myriad grounds raised by the defendant. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Paul G. Summers, Attorney General and Reporter; Gill R. Geldreich and Joseph F. Whalen, Assistant Attorneys General; Randall E. Nichols, District Attorney General, for the appellant, State of Tennessee.

Herbert S. Moncier and Gregory P. Isaacs, Knoxville, Tennessee, for the appellee, Thomas D. Huskey.

### OPINION

The defendant is charged with four counts of first degree murder. His first trial ended in a mistrial because the jury could not reach a unanimous verdict. Pending the retrial, this court entered an opinion in the defendant's consolidated appeal of multiple convictions including rapes, aggravated rapes, aggravated kidnapping, especially aggravated kidnapping, robbery, and aggravated robbery. See State v. Thomas Dee Huskey, No. E1999-00438-CCA-R3-CD, Knox County (Tenn. Crim. App. June 28, 2002), reh'g denied, (Oct. 11, 2002) (the rape cases). This court affirmed the

defendant's convictions for offenses versus two victims but reversed the convictions regarding a third victim and remanded those charges for retrial. Some of the evidence reviewed and issues analyzed in that appeal are relevant to the resolution of this case.

In the rape cases, the defendant contended that the trial court erred by not suppressing statements he gave to law enforcement officers on November 9, 10, and 11, 1992. This court did not reach the merits of the suppression issues because it concluded that the trial court did not make adequate findings of fact for appellate review under the circumstances then existing. This court stated:

> For example, the trial court has made no findings regarding members of law enforcement having contact with the defendant on November 4 and 5, 1992, in relation to Lieutenant Larry Johnson's testimony that the defendant initiated contact with him and TBI Agent David Davenport on November 9, 1992. For instance, meetings with the defendant on November 4 and 5 may cast doubt upon the credibility of Lt. Johnson's testimony regarding the questioning of the defendant. If the suppression of the statements is raised upon the retrial of [the victim's] case, the trial court should make complete findings, and take proof if appropriate, with regard to the issues surrounding the suppression of the statements.

Id. slip op. at 56-57.

Also in the rape cases, the defendant contended that the trial court erred by not suppressing as evidence the items seized during a search of his home. This court held that the search warrant obtained in Sevier County was invalid because it failed to list the name of the executing officer. Huskey, slip op. at 54. This court also held that the capias issued by the Knoxville City Court upon which officers claimed the authority to arrest the defendant was void and invalid, thereby making the defendant's arrest illegal. Relative to a remand of the case, this court stated:

> In the present case, the trial court's application of both the search incident to an arrest and the plain view exceptions require that the defendant's arrest be valid. Our holding that the capias upon which the defendant was arrested is void calls the trial court's reliance on these exceptions into question. Upon a retrial of [the victim's] case, the trial court must reexamine the propriety of the warrantless search. In this regard, we note that although the trial court found that the defendant's father consented to the search of his home, it did not determine whether the defendant's father's consent to search removed the need for a warrant. The trial court noted that the defendant's parents had the right to enter the defendant's bedroom as revealed by the defendant's mother entering the room to turn down the radio or to

> leave laundry in the room but stated that it "just include[d] that as [the court's] recollection of the facts in this case." We do not foreclose the state from showing upon remand that the search was valid.

Id. slip op. at 55. Upon remand of the rape case, the parties addressed the suppression issues relative to this murder case. We note, though, that despite this court's suggestion regarding the taking of additional proof, both the state and the defendant considered further proof unnecessary and requested the trial court to make its findings based upon the existing record. In separate orders, the trial court granted the defendant's motions to suppress his statements and the physical evidence seized from his home. With each issue being separate and distinct, we will state the facts relevant to each issue as the issue is discussed.

## I. DEFENDANT'S STATEMENTS

The state contends the trial court erred in ruling that the investigating officers did not "scrupulously honor" the defendant's invocation of his right to remain silent under the rule announced in Michigan v. Mosley, 423 U.S. 96, 96 S. Ct. 321 (1975). It also contends that the officers did not reinitiate interrogation of the defendant on November 9, 1992, in violation of Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981). The defendant argues that the investigating officers did not "scrupulously honor" his invocation of his right to remain silent on October 21, 1992, and that the officers' reinitiation of contact with him after he invoked his right to counsel on October 30, 1992, constitutes a violation of Edwards. The defendant maintains that these violations more than support the trial court's finding that the state failed to carry its burden to prove the defendant's right to remain silent was scrupulously honored, and he asserts that the record also supports a finding that the officers violated his right to counsel by reinitiating contact with him on November 4, 5, and 9, 1992. We conclude that under the totality of the circumstances, the record does not preponderate against the trial court's finding that the state failed to carry its burden of showing the defendant validly waived his Fifth Amendment rights by a preponderance of the evidence because the investigating officers did not "scrupulously honor" the defendant's right to remain silent and because they reinitiated contacts and communications with him on November 4, 5, and 9, 1992, after he invoked his right to counsel.

The primary evidence relating to the defendant's statements came from Lieutenant Larry Johnson of the Knox County Sheriff's Department. Johnson testified at two pretrial hearings and at the trial relative to the statements. Initially, though, we note that Knox County Sheriff's Detective Michael Upchurch testified that he was involved in the defendant's arrest on October 21, 1992, pursuant to a capias issued by the Knoxville City Court Clerk. He said that the defendant said he did not wish to answer any questions until they got a warrant and that Upchurch did not question the defendant after this statement.

At a suppression hearing on March 25, 1996, Lt. Johnson testified that he had been the head of the Homicide Division of the Knox County Sheriff's Department in 1992. He said that he was

investigating some homicides in East Knox County and learned that the defendant was in the Knox County jail. He noted that he had been out of the country when the defendant was placed in custody.

Lt. Johnson testified that, to his recollection, he, Det. Upchurch, and Tennessee Bureau of Investigation (TBI) Agent David Davenport went to the jail on October 29, 1992, and talked to the defendant. He said that the jail did not have any rights waiver forms and that he read the defendant the Miranda warnings from a card. Johnson said that he talked to a "person" the defendant identified as "Kyle."

Lt. Johnson identified a rights waiver form dated October 30, 1992, at 5:00 p.m. He noted that Agent Davenport had written on the form, "I do want a lawyer at this time, and will not answer any more questions now." He said he told the defendant, "If you don't have anything else to say, . . . there's no point in us continuing to talk."

Lt. Johnson testified that the next time he talked to the defendant, he was responding to the defendant's sending word through a correctional officer that the defendant wanted to talk to him and Det. Upchurch. He said he and Upchurch returned to the jail, advised the defendant of his rights, and asked if he was sure he wanted to talk with them and without an attorney. Johnson identified a rights waiver form dated November 10, 1992, at 11:45 a.m. He said that he explained the rights "very thoroughly" to the defendant and that the defendant signed the waiver. Johnson identified another rights waiver form dated November 11, 1992, at 2:10 p.m. He said the meeting occurred at the request of the defendant who had gotten word to a correctional officer to notify Johnson or Upchurch that the defendant wished to talk with them. Johnson said that he advised the defendant of his rights and that the defendant signed the waiver form with the name "Phillip Daxx."

Lt. Johnson testified that during the conversations with the defendant, one of the defendant's "purported alter egos" would appear. He said that in all the conversations, he would start with Tom Huskey but that he would end up talking to "Kyle" or "Phillip Daxx." He said the most extensive, detailed conversations were with "Kyle," who was the one who admitted involvement in the four murders and numerous rapes. Johnson said that when the defendant said he was someone else, Johnson would advise them of their rights and that "they acknowledged that they understood them, and kept talking."

Lt. Johnson identified his notes regarding a statement given by the defendant and a ten-page transcript of a typed statement, both obtained on November 9, 1992. He noted that the tape of the statement reflected in his notes was bad. He also identified a three-page statement dated November 11, 1992, at 2:15 p.m., given by the defendant "a/k/a Phillip Daxx." He said that soon after this statement, the defendant was appointed counsel who told him not to talk to the defendant without counsel present. As for further contact with the defendant, Johnson said, "I served some court capiases on him after that, but that was merely just advising him of some charges against him."

On cross-examination, Lt. Johnson testified that he returned from his trip after the defendant was arrested and that only one body had been found near Cahaba Lane. He said that more bodies

were found that week. He acknowledged being told that when arrested on October 21, 1992, the defendant told detectives that unless they had a warrant, he did not have anything to say. He said that Agent Davenport joined them to interview the defendant because he was investigating a Sevier County rape and old homicide. Johnson noted that the October 30 rights waiver form was signed by him, Davenport, Det. Upchurch, and Det. Darrell Johnson, who was investigating one of the homicides. He said he did not attempt to get the defendant an attorney after the defendant's request for one because it was not his place to do so. He said, however, that he told the defendant that the telephone book was full of attorneys and that the defendant could call one if desired, because he would not be initiating any further contact with the defendant.

Lt. Johnson identified a capias dated November 9, 1992, which noted service on the defendant at 2:25 p.m. relative to the rape cases. The capias was signed by Johnson and Agent Davenport. Johnson said that he, Davenport and Det. Upchurch talked with the defendant, who said he did not know anything. Johnson said he asked the defendant if he wanted coffee or to use the bathroom or to stop talking with them. He said the defendant replied he did not and requested coffee. Johnson said he and Davenport left the room and returned with coffee.

Lt. Johnson testified that Det. Upchurch then said he would like to introduce them to "Kyle." Johnson said that they talked to "Kyle" but that he noticed that the tape recorder was not working. He said that the defendant "came back," complaining about a headache and stating that he did not know what happened with "Kyle." Johnson said that "Kyle" returned and they obtained a taped statement.

Lt. Johnson said that the reason Agent Davenport joined him on November 9 was because of the Sevier County investigations. He said they served the capias and the defendant said, "Wait just a minute. We–I want to talk to you all. Let's talk." Johnson said that he did not recall Davenport arriving with knowledge that Johnson was going to serve the capias. He stated, "I was called by the court and told that one had been returned, and I came up and got it, and Davenport and I went and served it." He repeated that serving the capias was the first time he had contact with or any attempt to talk to the defendant since October 30, 1992.

At a December 17, 1998 hearing, Lt. Johnson was questioned about his interviews with the defendant. He said that the interviews occurred in the Jail Captain's office and that they tried to treat the defendant with respect. Johnson testified that on October 29 or 30, 1992, in the evening, the defendant was advised of his rights. He said that he and Agent Davenport left the room to get the defendant coffee, leaving the defendant with Det. Upchurch. When they returned, Upchurch said, "Larry, I would like to introduce you to Kyle." Johnson said that he and Davenport took notes and that the defendant, as "Kyle," gave a statement which provided information regarding the homicides on Cahaba Lane.

Lt. Johnson said that he did not talk to the defendant between October 30 and November 9, 1992. He said the other times he talked to the defendant were at the defendant's requests, except when they served a capias on him on November 9.

On cross-examination, Lt. Johnson was asked if he told the defendant after he requested a lawyer that the defendant could tell one of the jailers if he wanted to talk to the officers. Johnson replied that the defendant's request for a lawyer was not what Johnson would call a request. He said that the defendant asked him if he thought the defendant needed a lawyer and that he replied that he did not know, that it was up to the defendant. He said he got a telephone book, turned it to attorneys in the yellow pages, and told the defendant to call one if he desired. When asked if he recalled that on October 30, 1992, the defendant said, "I do want a lawyer and will not answer anymore questions now," Johnson replied, "to my recollection, no, sir, – well, not just to my recollection. If he had said that, I would have quit talking to him." When asked about the delay between October 30 and November 9, Johnson said that they were interviewing various people, trying to corroborate what "Kyle" had told them. Johnson recalled that November 9 was the day they had some capiases to serve on the defendant and took him to the Jail Captain's office for privacy. Johnson said that they talked to "Kyle," and he recalled talking briefly with "Timothy," whom he described as a homosexual. He said "Timothy" claimed to be protecting the defendant from "Kyle."

Finally, Lt. Johnson testified at the defendant's trial on January 28 and 29, 1999. He said that he was out of the country when the first body was discovered near Cahaba Lane and that three more bodies were found the week after he returned. He said that because three of the victims had prostitution arrests, detectives interviewed people concerning who may have been seen with the victims. He said that, among others, the defendant's name was mentioned.

Lt. Johnson said he and Agent Davenport went to the Knox County Jail around the end of October 1992 to talk with the defendant. He said he read the defendant his Miranda rights. He said that the defendant wanted to know if there were any charges pending and that he told the defendant there were not. He said the defendant said "maybe I ought to talk to a lawyer," which Davenport wrote on the rights waiver form. Johnson added that the defendant said that they "might wish to speak with him later if any charges were to be filed."

Lt. Johnson testified that the next conversation took place in the Jail Captain's office on November 9, 1992, at which time the defendant gave a statement to him, Agent Davenport and Det. Upchurch. Johnson also noted that statements were taken from the defendant on other days as well and identified them for the jury.

On cross-examination, Lt. Johnson acknowledged he had testified in December 1998 that he did not call the defendant's request for an attorney a request in that the defendant asked him if he thought the defendant needed an attorney. He also acknowledged being asked if the defendant specifically requested the lawyer and his responding, "To my recollection, no sir." He explained that he had not expected to testify at the December hearing and had none of his notes. He said that after the hearing, he reviewed his material and recognized he had made a mistake about the defendant's request. In this regard, Johnson also acknowledged that he had previously testified that October 30, 1992, was the first time he had talked to the defendant and that the defendant talked to them as "Kyle" and that they subsequently were interviewing people to corroborate what "Kyle" had told them. Johnson admitted that the date was a mistake.

Lt. Johnson denied talking with the defendant on October 29, 1992, but he acknowledged talking with the defendant on October 30 for fifteen or twenty minutes. He said there was no tape recording of that meeting. He said, though, that on the 30th, the defendant said, "When you get . . . some paperwork, why, I may talk to you." He said that the only time he took notes or taped the defendant was when the defendant claimed to be someone else. After a review of the records, including Agent Davenport's notes, Johnson acknowledged that he and Davenport talked with the defendant on October 29, 1992, from 10:05 a.m. until noon. He acknowledged that toward the end of the time, the defendant was allowed to call his parents and take a shower.

Lt. Johnson acknowledged that the records reflected that he, Agent Davenport, and Det. Upchurch talked with the defendant on October 30 with the initial conversation lasting from 10:00 a.m. until noon. He said that they broke for lunch and that the interrogation resumed at 12:35 p.m. and lasted until 2:15 p.m. Johnson acknowledged that the defendant said he wanted to go back to his cell and think. He said the records reflected that the defendant was brought out of the cell at 4:55 p.m. and told them that he wanted a lawyer because he did not know if he could trust them.

Lt. Johnson acknowledged recording a conversation on November 10, 1992, which he had with William Fletcher, a jail inmate, in which Johnson referred to Fletcher seeing him, Agent Davenport and Det. Upchurch on November 4 and 5, 1992, standing outside cell thirteen when they put the defendant back in the cell. Johnson acknowledged that Fletcher indicated he had seen them. Johnson admitted that he asked Fletcher, "After he was brought back to the cells after those occasions, did he sit and talk to you about what we had talked to him about?" Johnson denied that his comments to Fletcher indicated he had been questioning the defendant. He stated, "Well, you can have a conversation and not – you know, not interrogate someone . . . . And that is basically what we were doing. We were talking to Mr. Huskey, just chitchatting with him."

Lt. Johnson testified that he did not ask the defendant any questions about the homicide or anything else. When asked why he went to see the defendant on November 4 and 5 after the defendant requested an attorney, Johnson replied, "I have been an officer for thirty-one years. . . . As the saying goes, you can get more with honey than you can with vinegar." He said he was being nice to the defendant and was taking care of his requests, such as telephone calls to his parents and showers. Johnson also acknowledged that Davenport's notes reflected that the defendant said he wanted to ask some questions and, when asked, that he was willing to talk without a lawyer.

Relative to serving the capias on November 9, 1992, Agent Davenport's notes provide:

> Also, it should be noted that the Knox County Assistant District Attorney Bob Jolley, who was handling these cases, had requested that this agent be available to serve grand jury indictments on Thomas D. Huskey in an attempt to see if he will talk further with this agent and Lt. Johnson.

Johnson implied that he was unaware of the note. He said that they went to the jail to serve the capias and that if the defendant wanted to talk, they were going to be there to listen.

In granting the defendant's motion to suppress the statements he made on November 9, 10, and 11, 1992, the trial court found

> In 1998 it was revealed that there was considerably more than "background information" discussed with the defendant at the October 29 and 30 meetings when Agent Davenport's notes were produced through further discovery in preparation of the murder trial. In fact, it is obvious from the notes that there was substantial discussion relating to the murder cases leading up to the defendant's invocation of his right to an attorney. However, there was no reconsideration of the motion to suppress given prior to the trial of the murder cases based upon this information.

> In January of 1999, during the murder trial, Lieutenant Johnson testified for the first time regarding the November 4 and 5, 1992 contacts with the defendant. Although Lieutenant Johnson testified that no statements were elicited from the defendant at these meetings, he did indicate that the specific purpose of the contact was to make sure that the defendant's needs were being met, a function normally undertaken by jailers and not investigators. On cross-examination, Johnson acknowledged that "you can catch more with honey than with vinegar."

> Based upon the evidence, it is clear to this court that the defendant made two invocations of his rights under the Fifth Amendment. The first invocation occurred on October 21 when he indicated his desire to remain silent and cease questioning until investigators "had a warrant." The state argues that this invocation was equivocal and indicated that the defendant would discuss the cases voluntarily upon the filing of charges, in essence, an initiation of contact. The court finds this argument disingenuous in light of the investigators' repeated (at least four) contacts, which were uninitiated by the defendant, prior to the November 9 service of the capiases. It is also clear from the record that these contacts either discussed the investigations directly (October 29 and 30) or were undertaken with the specific purpose and hope that the defendant would volunteer information on his own (November 4 and 5). Following each invocation, investigators persisted in repeated contacts with the defendant culminating in the service of capiases on November 9 and the ensuing confessions by the defendant. It is also worthy to note

-8-

that the service of process on November 9 was personally done by Lt. Johnson, Agent Davenport and Det. Upchurch, at the direction of then Assistant District Attorney General Jolley, in the hopes that the defendant would change his mind and talk to them. . . .

As stated previously, it is clear to this court that the defendant invoked both of these rights, the first being his right to remain silent on October 21 and the second being his right to an attorney on October 30. The court concludes that on each occasion the defendant exhibited his intention to exercise his Fifth Amendment privileges. . . . There is ample evidence before this court that investigators failed to scrupulously honor the defendant's invocation of rights. The subject matter of all interrogations remained focused on the rape and murder investigations throughout the numerous police-initiated contacts with the defendant after the invocations occurred. . . . The court concludes that the state has failed to meet its burden to show that the defendant's rights were scrupulously honored. Despite two invocations, investigators continued to approach the defendant and either interrogate him directly or attempt to endear themselves to the defendant in hopes that he would discuss the investigations. In light of these new facts, the court cannot conclude that these statements were voluntary and self-initiated and not the product of "repeated efforts to wear down [the defendant's] resistance and make him change his mind." Therefore, having concluded that the investigators violated the defendant's Fifth Amendment right against self-incrimination by failing to scrupulously honor his assertions of his right to cease questioning and his right to counsel, and further that the defendant's statements were not the result of his own initiated contact with investigators, the defendant's motion to suppress is hereby GRANTED.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23.

In this regard, the state notes that the trial court made no findings regarding Lt. Johnson's interview with William Fletcher. We also note the trial court failed to comply with this court's suggestion in remanding the rape cases that the trial court make specific findings regarding witness credibility. However, the tenor of the trial court's findings reflect that it did not fully accredit Johnson's testimony. In any event, we need not ignore what was revealed in the Fletcher interview and in Johnson's testimony about the interview. Moreover, we need not ignore the changes in Johnson's testimony when confronted with Agent Davenport's notes.

## A. Right to Remain Silent

The state contends that the defendant's right to remain silent was "scrupulously honored" because the investigators ceased questioning him each time he asserted a Fifth Amendment right, they allowed ample time to pass before any reinterrogation, and they gave him fresh sets of Miranda warnings before any reinterrogation. The defendant responds that the multiple contacts the investigators had with him violated the invocation of his Fifth Amendment right to remain silent and that the record does not preponderate against the trial court's findings.

The United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself." State v. Berry, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9). If a suspect is in custody, the police must first inform him of his Fifth Amendment rights in order for his confession to be admissible as substantive evidence in the trial of the matter. See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966). Once informed of those rights, a suspect may voluntarily waive them and speak with the police or he may invoke his Miranda right against compulsory self-incrimination. Id. at 444-45, 86 S. Ct. at 1612; State v. Crump, 834 S.W.2d 265, 269 (Tenn. 1992), cert. denied, 113 S. Ct. 298 (1992). "The test of voluntariness for confessions under Article I, § 9 [of the Tennessee Constitution] is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." Id. at 268 (citing State v. Smith, 834 S.W.2d 915 (Tenn. 1992)). If a suspect indicates in any manner that he wishes to remain silent, custodial interrogation must cease. Miranda, 384 U.S. at 473-74, 86 S. Ct. at 1627 (1966); Crump, 834 S.W.2d at 269. After a suspect invokes his right to remain silent, police may not resume custodial interrogation unless the defendant's right to "cut off questioning" was "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 104, 96 S. Ct. 321, 326 (1975); Crump, 834 S.W.2d at 269. In order to introduce a defendant's confession into evidence at the trial of the matter, the burden rests upon the state to demonstrate a valid waiver by a preponderance of the evidence. See Colorado v. Connelly, 479 U.S. 157, 107 S. Ct. 515 (1986).

We note that in Lee v. State, 560 S.W.2d 82, 84 (Tenn. Crim. App. 1977), this court held under both the federal and state constitutions that the state's burden was to show a valid waiver by clear and convincing evidence. Lee has never been criticized or overruled. We also note that in State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997), our supreme court citing Connelly held that the state need only show a valid waiver by a preponderance of the evidence. The court relied, however, on federal constitutional law and did not address article 1, section 9 of our constitution or Lee's

contrary holding. In any event, we will determine whether the state showed a valid waiver by a preponderance of the evidence.

In Mosley, the Supreme Court considered when police could reexamine a suspect who had previously asserted his right to remain silent. 423 U.S. at 96, 96 S. Ct. at 321. Mosley was arrested on robbery charges and advised of his Miranda rights. After invoking his right to remain silent, the arresting officer placed him in a detention cell. Approximately two hours later, another officer came to interview the defendant about an unrelated homicide. He gave the suspect another set of Miranda warnings, and during the course of the subsequent interrogation, Mosley made incriminating statements. In reviewing the case under Miranda, the Court concluded that Mosley's invocation of his right to remain silent had been "scrupulously honored" because "[1] the police . . . immediately ceased the interrogation, [2] resumed questioning only after the passage of a significant period of time and [3] the provision of a fresh set of warnings, and [4] restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." Id. at 106, 96 S. Ct. at 327. The Court noted that "where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind," a constitutional violation would occur. Id. at 105-06, 96 S. Ct. at 327. However, the Court also noted that Miranda cannot "sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent" because such a reading could impermissibly create "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation." Id. at 102-03, 96 S. Ct. 326.

The federal circuit courts have split in applying Mosley. The minority position holds that the test constitutes conditions precedent to a showing of a defendant's valid waiver of his previously invoked Fifth Amendment rights. In other words, under this approach, unless all four conditions are met, there can never be a subsequent showing of valid waiver. See United States v. Barone, 968 F.2d 1378 (1st Cir. 1992) (holding that under "Mosley, a court need determine specifically whether there has been a voluntary waiver only after the government has carried its burden of showing that it complied with [all of] the required procedures"); accord Vujosevic v. Rafferty, 844 F.2d 1023, 1028-31 (3rd Cir. 1988) (holding that under Mosley, the government failed to demonstrate a valid waiver when police did not "scrupulously honor" the suspect's invocation of his right to remain silent by reinterrogating him about the same crime).

The majority position concludes that the Mosley test does not create a per se rule but provides factors that a court should consider under a "totality of the circumstances" approach. For example, in Weeks v. Angelone, 176 F.3d 249, 267-268 (4th Cir. 1999), the court determined that the Mosley Court stated factors to consider when determining whether the police had "scrupulously honored" a suspect's right to "cut off questioning," not a bright line rule. Accord United States v. Schwensow, 151 F.3d 650, 659 (7th Cir. 1998) (recognizing that a second interview is not rendered unconstitutional simply because it involved the same crime as previously discussed); United States v. McClinton, 982 F.2d 278, 282 (8th Cir. 1992) (focusing on whether the police "persisted in

'repeated efforts to wear down the person's resistance' in order to change the person's version of the facts," instead of on subject matter of the reinterrogation); United States v. Hsu, 852 F.2d 407, 410 (9th Cir. 1988) (holding that "an identity of subject matter in the first and second interrogations is not sufficient, in and of itself, to render the second interrogation unconstitutional"); cf. Hatley v. State, 709 S.W.2d 812, 815 (Ark. 1986) (stating Mosley's importance is focused on "strict adherence to its dictates of scrupulously honoring the defendant's right to remain silent" and finding the Court's emphasis "on interrogation about a different crime is, we believe, misplaced"); State v. Stanley, 613 A.2d 788 (Conn. 1992) (rejecting the view that Mosley stands for the proposition that "the police can never reinterrogate a suspect, who has invoked his right to remain silent, regarding the same crime about which he had refused to talk"). According to the analysis of the Weeks court and others in accordance with its interpretation of Mosley, the relevant question to consider is whether under the "totality of the circumstances," the police "scrupulously honored" a suspect's right to "cut off questioning."

We agree with the majority of the circuit courts and conclude that reinterrogation of a suspect concerning the same subject matter does not constitute a per se violation of Miranda under Mosley. However, we believe it is an important factor to consider under a "totality of the circumstances" test. In that regard, we conclude that because the officers reinterrogated the defendant about the same subject matter on at least three separate occasions after he invoked his right to remain silent and because they attempted to curry favor with the defendant on two other occasions by allowing him to shower and telephone family members, the officers' actions constituted a persistent effort to wear down the defendant's resistance and "make him change his mind." Further, we conclude that the record preponderates against the trial court's implied findings that the November 4 and 5 contacts did not include discussions about crimes with the defendant. The record reflects that Lt. Johnson spoke to William Fletcher, a jailmate of the defendant, after the November 4 and 5 contacts. Johnson asked Mr. Fletcher whether the defendant discussed with him about what the detectives had talked to the defendant on November 4 and 5. It is simply unreasonable to conclude that Johnson was not referring to substantive conversations he and the other detectives had with the defendant on November 4 and 5. Therefore, we believe that after the defendant invoked his right to remain silent, the detectives requestioned him at least three additional times and met with him on two other occasions where, at the least, the conversations concerned the same subject matter. Given these facts, we hold that the evidence does not preponderate against the trial court's finding that the state failed to meet its burden of showing the defendant's Fifth Amendment right to remain silent was "scrupulously honored."

### B. Right to Counsel

Because the defendant invoked his right to counsel after he invoked his right to remain silent and because the constitutional analysis of when a violation of these rights occurs is different, we next address whether the officers violated the defendant's invocation of his right to counsel. The state contends that the defendant's invocation of his right to counsel was not violated because even though the investigators reinitiated contact with him on November 4, 5, and 9, no interrogation occurred until the defendant initiated a conversation on November 9, indicating his willingness to discuss the

-12-

charges against him. The defendant contends that the state has confused the issue of its duty to honor a suspect's asserted right to remain silent scrupulously under Mosley with its duty to have no further contact in the absence of counsel after a suspect asserts his right to the assistance of counsel under Edwards. He argues that the state violated his asserted right to counsel by initiating contact with him on November 4, 5, and 9, culminating in his confession. We agree with the defendant.

In Miranda, the Court stated that if a suspect during custodial interrogation requests an attorney, "the interrogation must cease until an attorney is present." 384 U.S. at 474, 86 S. Ct. at 1627-28. When such a request is made and "the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Id. at 475, 86 S. Ct. at 1628 (emphasis added).

The Court in Edwards "reconfirm[ed] these views and, to lend them substance, emphasize[d] that it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." 451 U.S. at 485, 101 S. Ct. at 1885. "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Id. at 484, 101 S. Ct. at 1884-85. Further, a suspect "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." Id. at 484-85, 101 S. Ct. at 1885. The Court, however, did not suggest that police could never use incriminating statements given by a suspect who first invoked his right to counsel. For example, the Court stated,

> Had Edwards initiated a meeting . . . , nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial. The Fifth Amendment right identified in Miranda is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver.

Id. at 485-86, 101 S. Ct. 1885 (emphasis added).

In determining whether a valid waiver of a suspect's invocation of his right to counsel has occurred, the proper question is whether "the accused, not the police, reopened the dialogue with the authorities. . . . [A] knowing and intelligent waiver cannot be found once the Fifth Amendment right to counsel has been invoked unless the accused initiates the renewed contact." Id. at 486 n.9, 101 S. Ct. at 1885 n.9 (emphasis added); see also Wyrick v. Fields, 459 U.S. 42, 45-46, 103 S. Ct. 394, 396 (1982) (stating that an accused who has previously asserted his right to counsel must himself

-13-

reinitiate a "dialogue with the authorities"); United States v. Whaley, 13 F.3d 963, 967 (6th Cir. 1994) (holding "an Edwards initiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case"). In Patterson v. Illinois, 487 U.S. 285, 291, 108 S. Ct. 2389, 2394 (1988), the Supreme Court, commenting on a valid waiver by a suspect who had invoked his right to counsel, noted, "Had petitioner indicated he wanted the assistance of counsel, the authorities' interview with him would have stopped, and further questioning would have been forbidden (unless petitioner called for such as meeting)." (Emphasis added).

The Supreme Court has explained that Edwards "serves the purpose of providing 'clear and unequivocal' guidelines to the law enforcement profession." Arizona v. Roberson, 486 U.S. 675, 681-82, 108 S. Ct. 2093, 2098 (1988) (quoting Fare v. Michael C., 442 U.S. 707, 718, 99 S. Ct. 2560, 2568 (1979)).

> "If the police do subsequently initiate an encounter in the absence of counsel . . . , the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is 'designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights.'"

McNeil v. Wisconsin, 501 U.S. 171, 177, 111 S. Ct. 2204, 2208 (1991) (quoting Michigan v. Harvey, 494 U.S. 344, 350, 110 S. Ct. 1176, 1180 (1990)). The bright line rule announced in Edwards reflects the Supreme Court's concern that "if a suspect believes that he is not capable of undergoing [custodial] questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." Roberson, 486 U.S. at 681, 108 S. Ct. at 2097-2098 (citations omitted). "Once a suspect invokes the Miranda right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present." McNeil, 501 U.S. at 177, 111 S. Ct. at 2208.

In Oregon v. Bradshaw, 462 U.S. 1039, 103 S. Ct. 2830 (1983), after invoking his right to counsel, the suspect subsequently initiated a conversation with police while being transported to a different detention facility when he asked the transporting officer, "What is going to happen to me now?" The ensuing conversation led to an interview complete with Miranda warnings, resulting in a polygraph examination which led to the suspect making incriminating statements. A plurality of the Court concluded that the suspect validly waived his previously asserted right to counsel under the Edwards rule by initiating a new conversation notwithstanding the fact that, technically, law enforcement initiated contact with him by removing him from his cell for transportation. Bradshaw, 462 U.S. at 1046-47, 103 S. Ct. at 2835. However, we note that while Bradshaw qualifies the Edwards bright line rule, eight of the Justices in that case still required that the defendant initiate the

conversation or communication. "If Edwards is to be further modified . . . , it is for the Supreme Court to do it." United States v. Ortiz, 177 F.3d 108, 110 (1st Cir. 1999).

In State v. Claybrook, 736 S.W.2d 95 (Tenn. 1987), our supreme court, citing Edwards and Bradshaw, considered whether a suspect who had previously invoked his right to counsel subsequently made a valid waiver by reinitiating a conversation. The suspect initially requested counsel after an investigating officer noticed blood stains on his clothing. Later, while he was being led down a hallway in the detention facility, the suspect saw the district attorney general and asked to speak with him. During the ensuing questioning, the suspect waived his previously asserted right to counsel and made a statement. Claybrook, 736 S.W.2d at 102. The court held the suspect's waiver was valid. Id. at 103.

In its response to the defendant's motion to suppress, the state in the trial court cited Bromfield v. Freeman, 923 F. Supp. 783 (E.D.N.C. 1996), for the proposition that an investigating officer who serves a warrant on a suspect who previously invoked his right to counsel does not reinitiate contact under the exception in Bradshaw. Under this view, a suspect's subsequent indication of a willingness to talk about the charges and his resulting confession will not offend the Fifth Amendment so long as a valid waiver was obtained.

In Bromfield, the suspect invoked his right to counsel. Thereafter, police investigators served felony murder warrants on the suspect while he was incarcerated in the local detention facility, hoping that he "would choose to provide further information." In reviewing the subsequent conviction, the court found

> that service of subsequent warrants upon an incarcerated accused is a normal incident both of arrest and custody. The contact that the police had with petitioner when they served him with the second set of warrants, along with any "inquiries or statements relating to" this "routine incident of the custodial relationship," could not violate the right to counsel. Even where a suspect has invoked his Fifth Amendment right against further uncounseled interrogation on any subject, the police "are free to inform the suspect of the facts of the second investigation as long as such communication does not constitute interrogation. . . ." To the extent that petitioner expressed a desire to give the police a third interview upon being informed of the warrants, the Court finds that it was the petitioner, not the police, who "initiated" further communication.

Bromfield, 923 F. Supp. at 788.

We do not view Bromfield to be persuasive in the context of the present case. While the Bromfield court considered the service of a warrant by the very same officer who had previously interrogated the defendant a routine incident of the custodial relationship, we note that the Supreme

Court gave but two examples of routine incidents of the custodial relationship that would not be considered an initiation of contact: a request for a drink of water or the use of a telephone. See Bradshaw, 462 U.S. at 1045, 103 S. Ct. at 2835. The facts of Bradshaw also stand as a third example: contacts necessary to facilitate transportation of a detained suspect. However, we decline to extrapolate from these examples that the investigating officers in this case, who previously initiated contact with the defendant twice and whose primary purpose in serving the capias on the defendant was to obtain his confession, did not offend Edwards when they used the capias as a ruse with the fervent desire that the defendant ask so much as "I have some questions about this" in order to reinterrogate him in the absence of counsel.

We further conclude that even if the serving of such process by the same investigators is not a reinitiation of contact under Edwards, the facts of the present case lead us to the conclusion that the investigators violated the defendant's assertion of his right to counsel under Edwards by reinitiating contact with him on November 4 and 5. These contacts were undertaken by investigators because in the words of Lt. Johnson, you can get "more with honey than with vinegar." While this may indeed be a true statement and even a legitimate law enforcement technique, we conclude that the investigators violated the defendant's asserted right to counsel under the Fifth Amendment by reinitiating contact, communication, dialogue, or meeting with him on November 4 and 5. Based upon Johnson's interview with William Fletcher and General Jolley's comments to Agent Davenport about serving the capias, we conclude that the investigating officers' contact on November 4, 5, and 9 cannot be said to have arisen as a routine incident of the custodial relationship as it was designed to elicit a confession from the defendant. These contacts violated Edwards' bright line rule, culminating in the defendant's confession. Because the defendant remained in state custody during this entire period, we discern no attenuation of the constitutional violation. Indeed, the defendant's desire to talk generally about his case was the direct and proximate result of the influence of the police investigators on five separate occasions, and his waiver cannot be said to comply with Edwards.

Edwards established a bright line rule which the investigating officers violated by reinitiating contact, communication, dialogue and meetings with the defendant. In order to comply with the constitutional mandates, if the state wanted to interrogate the defendant on November 9, ten days after he requested the assistance of counsel, it needed simply to provide him the attorney he requested. In this regard, we conclude the evidence does not preponderate against the trial court's finding that the state failed to carry its burden to show valid waiver.

## II.  ARREST, SEARCH, AND SEIZURE

The state contends that the items seized from the defendant's home are admissible as evidence because the police arrested the defendant in good faith reliance upon a Knoxville City Court capias subsequently declared void and because the defendant's father consented to the search of the defendant's room. The defendant asserts that Tennessee does not recognize a good faith exception and that one should not exist, in any event, when the state relies upon a void capias. He also notes the trial court found that no consent to search was given.

-16-

The evidence regarding the defendant's arrest and the search of his home on October 21, 1992, was summarized by this court in the defendant's rape case as follows:

> At a February 7, 1996 suppression hearing, Knox County Sheriff's Detective Michael Upchurch testified that he was in charge of investigating the homicides, which occurred near Cahaba Lane in Knoxville in October 1992. His investigation caused him to focus on the defendant as a suspect, and he checked for outstanding warrants against the defendant. He found an outstanding capias for failure to appear in Knoxville Municipal Court on a charge of solicitation of prostitution. Knowing that the defendant had been employed at Teagues Statuary in Sevier County, Detective Upchurch asked the Sevier County Sheriff's Department to have an officer meet him and Detectives Darrell Johnson, Dan Stewart, Mike Freeman, and Mike Grissom to arrest the defendant on the capias and for questioning about the homicides. They first went to the statuary and then proceeded to the defendant's parents' mobile home, where Detective Upchurch saw a truck matching a description given in conjunction with his investigation parked in the driveway.
>
> Detective Upchurch testified that at 9:30 p.m., he and Officer Jerry Huskey of the Sevier County Sheriff's Department went to the front door of the mobile home and that the other officers went to the back door. Officer Huskey was in uniform and had parked his cruiser in front of the mobile home. The defendant's mother answered the door, and he and Officer Huskey identified themselves. Detective Upchurch told her that he wanted to see the defendant, that a court had issued a capias for the defendant for failure to appear in court, and that they were taking the defendant into custody at that time. Mrs. Huskey told him that her husband and the defendant were in their beds and that she would get the defendant. She invited them inside. The defendant came into the living room and asked what they wanted. Detective Upchurch told him why they were there and that they wanted to talk to him. The defendant said, "Fine. I need to get my shoes." Detective Upchurch told the defendant that he could get his shoes but that they would have to accompany him to his bedroom because he was in custody. The defendant agreed to this and walked ahead of them down the hallway.
>
> Detective Upchurch testified that while he and Detective Stewart were standing just inside the doorway of the defendant's bedroom, he saw an orange hay-baling rope on the defendant's floor. He recognized it as the type of rope used to bind the rape victims. As

the defendant sat on his bed putting on his shoes, Detective Upchurch illuminated a dresser with his flashlight and saw a pair of women's earrings and a necklace on the top. The day before, one of the homicide victims' boyfriends had told him that the victim had earrings in her purse. He did not confront the defendant with the rope and jewelry at this point. The defendant refused to sign a consent to search form and was then transported to the Sevier County Jail.

Detective Upchurch testified that Detective Stewart remained at the defendant's bedroom door to make sure that nothing was moved. The other detectives waited in their unmarked cars. Although the defendant's father had given his consent to search the whole residence, the Assistant District Attorney advised him by telephone that he should get a search warrant for the defendant's bedroom. The Sevier County Sheriff's Office provided him with a search warrant form. He consulted with the Assistant District Attorney again and drafted the affidavit and warrant. He acknowledged that he was not familiar with Rule 41, Tenn. R. Crim. P., but that he had undergone training relating to search warrants and was familiar with probable cause. Nevertheless, at the time of the hearing, he had written only a few search warrants. He admitted that the search warrant affidavit did not mention the jewelry that he had seen in the defendant's room. He said that he noted the jewelry on the list of items for which he was searching because he had seen it in the room and knew it was there.

Detective Upchurch testified that he told Officer Huskey that he needed to go to a judge or magistrate to get a search warrant signed, and Officer Huskey agreed to take him. He was taken to Bruce Baker, who was introduced as a Sevier County magistrate. He handed the warrant to Mr. Baker and asked if he needed to do anything else before Mr. Baker signed it. Mr. Baker signed the warrant, and Detective Upchurch made three copies. He gave one of the copies to Mr. Baker, and the other two copies were for the defendant and his father. Once he obtained the signed search warrant, he returned to the defendant's parents' home and conducted the search. When Detective Stewart picked up the earrings to bag them, Detective Upchurch saw a blonde hair entwined with the necklace and the earrings. In addition to the items found in the defendant's bedroom, he found a knife on the bathroom sink. He said that the defendant's parents never objected to the search of their mobile home, and the defendant never objected to the officers entering his bedroom at the time of his arrest.

Detective Upchurch testified that the defendant arrived at the Knox County Jail at 4:00 a.m. on October 22. Detective Upchurch was not at municipal court when the defendant appeared and did not speak to anyone associated with that charge. He did not consider the defendant to be under arrest for the death of Patricia Rose Anderson until the Knox County Grand Jury returned an indictment for that charge.

Jerry Huskey testified that on October 21, 1992, he was a patrolman with the Sevier County Sheriff's Department, when Knox County officers asked him to help them in investigating the defendant. He confirmed the truth of his affidavit, which stated that the officers showed him a folded capias and told him that it was for the defendant, but said that he did not read it. He took them to the statuary and then to the Huskey residence. He thought that the defendant's father invited them inside. The defendant was not wearing shoes when he first saw the defendant. He heard the detectives ask the defendant's father if they could search the mobile home. The defendant's father agreed to let them search but told them that they would have to ask the defendant about his room. The detectives asked the defendant if they could search his room. The defendant said they could not search his room, and they got a search warrant. He did not see the detectives violate the defendant's rights, and he believed that they acted in a professional manner. He acknowledged that his report states that he transported the defendant to the Knox County line where the defendant was charged with homicide.

Knox County Sheriff's Detective Daniel Stewart testified that on October 21, 1992, he went to the defendant's house with Detective Upchurch. When the defendant walked into his parents' living room, Detective Upchurch announced that the defendant would be taken into custody for failure to appear in court. Detective Stewart considered the defendant to be in custody at that point. He said he accompanied the defendant to his bedroom for shoes or a shirt. He was standing either in the doorway or just inside the room, and Detective Upchurch stood beside him. He noticed a piece of orange baling twine on the floor by the bed. Detective Stewart said that a rhinestone necklace with a hair entangled in it and a pair of costume pearl earrings were found on a piece of furniture immediately on the left through the doorway, but he did not remember if he saw the jewelry when the defendant was getting his shoes or when they executed the search warrant. The top of the piece of furniture was

cluttered, and the jewelry was either on top of or near the edge of some newspapers. When the defendant was taken to jail, Detective Stewart remained at the mobile home to ensure that the defendant's bedroom was not disturbed. He did not search the room while the other officers were away. During that time, the defendant's mother entered the room to turn off a light or radio, and as she left, the rope caught on her foot and was dragged a few inches.

Jessie Huskey, the defendant's mother, testified that she was awakened by knocking after 9:00 p.m. on October 21, 1992. When she opened the door, men wearing police uniforms asked if her husband was there. She said that he was there and called for him. One of the men asked if the defendant was there. She said yes and knocked on the wall adjacent to the defendant's bedroom. She did not ask the officers to come inside. The officers stood in the door until her husband arose. When the defendant entered the living room in his pajama bottoms, the officers walked over to him. At that point, she went to her bedroom to get a housecoat, and when she returned, the officers and the defendant were gone. She never heard the officers ask her husband for permission to search their home or say that they were there to arrest the defendant because he failed to appear for court. The defendant had previously told her that he went to court.

Mrs. Huskey testified that she was frightened and nervous because the officers had taken the defendant. One officer remained standing at the defendant's bedroom door. She denied offering a stool to the officer, who stood the entire time. The officer watched her go into the defendant's bedroom and asked what she was going to do. She told him that she was going to turn the radio off, which she did and then left the room. She noted that a chest of drawers was built into the wall in the defendant's bedroom and that one could not see the chest unless he or she stepped into the room. The officers returned and searched the trailer, but she did not hear her husband give them permission to search. She did not know what was in the defendant's room because she never went in his room except to leave his clean laundry on the bed.

Huskey, slip op. at 38-41.

In the order granting the defendant's motion to suppress items seized from his bedroom, the trial court found that the consent given by the defendant's parents to search the residence did not include permission to search the defendant's bedroom. However, the trial court considered the issue

of consent to be irrelevant, because it concluded the officers had no lawful basis to be in the Huskey residence. It noted that this court had held that the capias upon which the defendant was arrested was not legal process and was unlawful. It stated, in part, the following:

> After the officers had entered the Huskey residence, defendant, Thomas Dee Huskey, came out of his bedroom and was advised by the officers that they had a warrant for his arrest. Defendant asked and was given permission to return to his bedroom to get a pair of shoes, but was advised that officers would have to accompany him to the bedroom to which the defendant agreed. When the defendant went to his bedroom to put on his shoes the two officers who accompanied him observed certain items in his bedroom that they considered to be evidence in the criminal cases against Mr[.] Huskey, including a piece of orange twine and items of womens jewelry that were in plain view within the room.
>
> Based on the fact that this court found that the law enforcement officers were in possession of a valid arrest warrant for the defendant, and that the items were in plain view of the officers during a lawful arrest of the defendant, the court found that these items were lawfully seized incident to the arrest. In the appeal of his rape convictions the defendant raised the issue of the defendant's arrest and the validity of the capias (arrest warrant) issued by the Knoxville City Court, which was the process used to arrest the defendant on October 21, 1992, in Sevier County.
>
> The Court of Criminal Appeals further ordered this trial court to re-examine the validity of the seizure of the evidence now at issue in light of that ruling.
>
> The basis upon which this court previously held that the evidence was properly seized was premised on the fact that law enforcement officials had a lawful capias (arrest warrant) for the defendant, and that the evidence at issue was in plain view and seized incident to the lawful arrest of the defendant. The Court of Criminal Appeals having now held that the arrest warrant was not valid, completely changes the rational for this court's prior ruling on this issue. If law enforcement officers did not have a valid arrest warrant, they had no lawful basis upon which to present themselves at the Huskey residence and gain admittance into the residence for the purpose of serving that process. Since the arrest of Mr. Huskey was unlawful, it naturally follows that evidence seized in plain view of the officers during that arrest is likewise unlawful and must be excluded.

Further, this court does not believe that law enforcement officers can present themselves at the residence of a citizen and advise that citizen that they have a lawful arrest warrant for an occupant of the home, and then seek consent to search that home incident to that lawful arrest when in fact the underlying arrest warrant is unlawful. In State v. Clark, 844 SW2d 597 (Tenn. 1992), another warrantless search case, our Supreme Court found that "consent to enter and search a home will not be lightly inferred, nor found by mere acquiescence to unlawful authority". Clark at 599.

Therefore, this court arrives at the inescapable conclusion that the evidence was not seized as part of a lawful arrest, nor was the consent to search that was obtained incident to that arrest valid. Defendant's Motion to Suppress this Evidence is, therefore, **GRANTED**.

## A. Good Faith

In the rape cases, this court held that the capias upon which the defendant was arrested was improperly issued by the Knoxville City Court Clerk and was void because it did not run or issue in the name of the State of Tennessee. Huskey, slip op. at 50. It also held that the search warrant for the defendant's home was invalid because it failed to name the officer to whom it was issued in violation of Rule 41(c), Tenn. R. Crim. P. In the present case, the state does not contest these rulings. However, it contends that it should be allowed to use as evidence the items seized as a result of the search of the defendant's home. It asserts that the officers acted in good faith and with objectively reasonable reliance on the capias purportedly issued by the Knoxville City Court for the defendant's failure to appear in court. It argues that the capias was not invalid due to unlawful police conduct but due to judicial error. The state essentially requests the court to adopt the "good faith" exception to the exclusionary rule as was done in United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405 (1984). This exception would permit evidence seized in reasonable, good faith reliance upon a search warrant subsequently found to be defective to be introduced during the prosecution's case-in-chief.

We believe a short history of the exclusionary rule relevant to this case is appropriate. In Hughes v. State, 145 Tenn. 544, 238 S.W. 588 (1922), the Tennessee Supreme Court held that evidence obtained in violation of Article I, section 7 of the Tennessee Constitution should be excluded as evidence. The court stated:

The state, having through its executive representatives produced the evidence of a violation of the law by one of its citizens by means prohibited by the Constitution, cannot be permitted through its judicial tribunal to utilize the wrong thus committed against the citizen to punish the citizen for his wrong; for it was only by violating

-22-

his constitutionally protected rights that his wrong has been discovered. It is no answer to say that it matters not how a citizen's sins have been found out. Security from unlawful search is the right guaranteed to the citizen, even for the discovery of the citizen's sins. This right we must protect, unless we may with impunity disregard our oath to support and enforce the Constitution. The experience of our forefathers with unlawful searches and seizures was deemed by the people who framed the Constitution sufficient to warrant the provision by which in instances even the guilty might escape detection and punishment.

Id. at 565-66, 238 S.W. at 594.

In Hampton v. State, 148 Tenn. 155, 252 S.W. 1007 (1923), the first case to apply the exclusionary rule in Tennessee, the Tennessee Supreme Court found deficiencies in the affidavit and warrant which it attributed to the "carelessness" or "oversight" of the magistrate issuing the warrant. Even though it determined that "[t]he officers acting in [the] case did so in good faith," it held that the evidence seized under the invalid warrant should have been excluded. Id. at 161, 252 S.W. at 1008-09. It stated that the requirements of the constitution and statutes regarding search warrants and affidavits were not difficult and should be followed. We believe Hampton reflects a concern that both officers and magistrates must be vigilant in ensuring that the requirements of the constitution and the statutes be followed. In other words, the security of citizens in Tennessee "in their persons, houses, papers and possessions, from unreasonable searches and seizures" provided in Article I, section 7 of the Tennessee Constitution protects them from inappropriate conduct by the government, regardless of which agency or branch and of whether issuance or execution related.

The Tennessee Supreme Court has consistently recognized that the search and seizure requirements of the constitution and statutes are not difficult to follow. We note that in Everett v. State, 182 Tenn. 22, 28, 184 S.W.2d 43, 45 (1944), the court stated

> The use of printed forms has made the procurement of a search warrant the merest formality, considering the fundamental constitutional right which the search invades. Certainly, this Court can do no less than to require that the few blank spaces be filled in, and the other details of the formality be carried out with care and precision.

Even the legislature dealt with the importance of a citizen's rights requiring magistrates to comply with the law. In 1959, the following statute was enacted:

> 40-518. Copies of search warrants required – Endorsement – Evidence. – All magistrates, clerks of court, judges and any other person or persons whomsoever issuing search warrants shall prepare

-23-

an original and two (2) exact copies of same one (1) of which shall be kept by him as a part of his official records, and one (1) of which shall be left with the person or persons on whom said warrant is served. The original search warrants shall be served and returned as provided by law. The person or persons as aforesaid who issue said warrants shall endorse the warrants showing the hour, date, and the name of the officer to whom the warrants were delivered for execution, and the exact copy of such warrant and the endorsement thereon, shall be admissible in evidence in the courts. Failure to comply with this section shall make any search conducted under said warrant an illegal search and seizure.

See 1959 Pub. Acts ch. 241. In Talley v. State, 208 Tenn. 275, 278, 345 S.W.2d 867, 869 (1961), the Tennessee Supreme Court stated that the intent of the statute "was to secure the citizen against carelessness and abuse in the issuance and execution of search warrants." (Emphasis added).

In 1978, Tennessee adopted the Rules of Criminal Procedure which also deal with search and seizure. Rule 41(c) provides essentially the same requirements as T.C.A. § 40-518:

Issuance; Contents; Copies; Failure to comply.— A warrant shall issue only an affidavit or affidavits sworn to before the magistrate and establishing the grounds of issuing the warrant. If the magistrate is satisfied that grounds for the application exist or that there is probable cause to believe that they exist, the magistrate shall issue a warrant identifying the property and naming or describing the person or place to be searched. The finding of probable cause may be based upon hearsay evidence in whole or in part. The search warrant shall be directed to and served by the sheriff or any deputy sheriff of the county wherein issued. Any constable, or any other peace officer with authority in the county. The search warrant shall command the peace officer to search forthwith the person or place named for the property specified. The magistrate shall prepare an original and two exact copies of the search warrant, one of which shall be kept by the magistrate as a part of his or her official records, and one of which shall be left with the person or persons on whom the search warrant is served. The magistrate shall endorse upon the search warrant the hour, date, and name of the officer to whom the warrant was delivered for execution; and the exact copy of the search warrant and the endorsement thereon shall be admissible evidence. Failure of the magistrate to make said original and two copies of the search warrant or failure to endorse thereon the date and time of issuance and the name of the officer to whom issued, or the failure of the serving officer where possible to leave a copy with the person or persons on

> whom the search warrant is being served shall make any search
> conducted under said search warrant an illegal search and any seizure
> thereunder an illegal seizure.

(Emphasis added). Because of the creation of this rule, T.C.A. § 40-518 was repealed. See 1979 Pub. Acts Ch. 399, §§ 1, 5; T.C.A. § 40-518 (repealed) Compiler's Notes (Supp. 1980); see also State v. Steele, 894 S.W.2d 318, 319 (Tenn. Crim. App. 1994) (concluding that a similar intent exists for Rule 41(c) as existed for T.C.A. § 40-518). Considering the foregoing, we conclude that adopting a good faith exception under the Tennessee Constitution would unduly reduce the protections contemplated for our citizens by the Tennessee Constitution, the legislature, and the Tennessee Supreme Court.

As previously noted, the state's brief does not directly rely on the search warrant, but upon the capias issued by the Knoxville City Court Clerk. Given the historical interest in ensuring that citizens be secure against unreasonable government intrusion, we do not believe that the issuance of a capias affords the state any greater latitude than a search warrant.

In any event, as the defendant argues, we conclude that a good faith exception cannot apply to a void arrest warrant or other arrest order issued by a person without issuance authority. We are persuaded by the analysis in United States v. Scott, 260 F.3d 512 (6th Cir. 2001), in which the court concluded that a retired Sequatchie County General Sessions judge did not have the authority to issue the search warrant in question. In rejecting a claim of good faith reliance, the court stated:

> Despite the derth of case law, we are confident that Leon did not contemplate a situation where a warrant is issued by a person lacking the requisite legal authority. Leon presupposed that the warrant was issued by a magistrate or judge clothed in the proper legal authority, defining the issue as whether the exclusionary rule applied to "evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." Leon, 468 U.S. at 900, 104 S. Ct. 3405 (emphasis added). Indeed, Leon noted that it left "untouched the probable-cause standard and the various requirements for a valid warrant." Id. at 923, 104 S. Ct. 3405. At the core of these various requirements is that the warrant be issued by a neutral and detached judicial officer. See, e.g., Shadwick v. City of Tampa, 407 U.S. 345, 350, 92 S. Ct. 219, 32 L.Ed.2d. 783 (1972). We therefore hold that when a warrant is signed by someone who lacks the legal authority necessary to issue search warrants, the warrant is void ab initio.

Scott, 260 F.3d at 515.

-25-

In the defendant's rape case, this court concluded that the Knoxville City Court Clerk did not have authority to issue the capias. Huskey, slip op. at 51. As importantly, this court concluded that the capias was void because it was issued in the name of the City of Knoxville and not the State of Tennessee. Id. slip op. at 50; See McLendon v. State, 92 Tenn. 520, 525, 22 S.W. 200, 202 (1893) (holding that a writ or other process that does not properly run in the name of the State is void upon its face). We conclude that the trial court correctly suppressed the items seized from the defendant's residence.

## B.  Consent

The state acknowledges that the trial court found that the defendant's father's consent to search did not extend to the defendant's bedroom. It claims, though, that whether Mr. Huskey consented to a search that did not include the defendant's bedroom "is disputed" and that its position is that Mr. Huskey consented to a search of the defendant's room. We note, however, the trial court's findings will be sustained as long as the evidence does not preponderate against those findings. In this regard, Detective Upchurch's testimony supports a finding of consent while Patrolman Huskey's testimony supports a finding of no consent to search the defendant's room. Under these circumstances, we defer to the trial court who had the opportunity to observe the witnesses. We conclude that the evidence does not preponderate against the trial court's finding that the defendant's parents did not consent to a search of the defendant's bedroom.

The state also asserts that evidence shows that when the officers "asked" the defendant to come with them, he agreed to let them accompany him to his bedroom in order for him to get his shoes. They assert that he did not object to the officers' presence in his bedroom at that time. The problem with this argument is that the evidence reflects that the officers had already told the defendant that he was in custody and that they would have to accompany him to his room in order to get his shoes. We believe the record supports a finding that the defendant acquiesced to authority and did not voluntarily consent to the officers entering his room. See Bumper v. North Carolina, 391 U.S. 543, 549-50, 88 S. Ct. 1788, 1791-92 (1968); State v. Clark, 844 S.W.2d 597, 599 (Tenn. 1992) ("Consent to enter and search a home will not be lightly inferred, nor found by mere acquiescence to unlawful authority.").

## III.  DEFENDANT'S OTHER ISSUES

The defendant states that if we reverse the trial court's ruling suppressing his statements or the evidence seized from his home, we should consider other grounds he raises for suppression of the statements or evidence. Relative to his statements, the defendant claims that his rights were not waived and his statements were not made knowingly, voluntarily, and intelligently because he was mentally ill, illegally arrested, and illegally detained; that the statements were obtained in violation of his Sixth Amendment right to counsel; and that the statements were obtained by investigators whose oaths of office were not filed in the Knox County Clerk's office, thereby rendering the investigators' actions illegal as Class C misdemeanors. See T.C.A. §§ 8-18-109, -113.

Relative to the items seized from his home, the defendant claims that they were illegally seized because their criminal relevance was not immediately apparent and was only determined after the seizure. He also claims that the items were seized by criminal acts in that the investigators had not filed their oaths of office in the Knox County Clerk's office.

Obviously, our ruling in this case obviates any need to address the issues the defendant raises only as a contingency. However, we also believe that the status of this case does not require us to address the defendant's issues regardless of our ruling. The state's appeal of a pretrial order suppressing evidence is ordinarily interlocutory in nature. See State v. Phillips, 30 S.W.3d 372, 373 (Tenn. Crim. App. 2000). However, if the "substantive effect of the ruling results in a dismissal of the indictment," the state may proceed by an appeal as of right under Rule 3(b), T.R.A.P. Id. On the other hand, because a defendant may appeal an order denying suppression if convicted, this court is not inclined to allow an interlocutory appeal in such a case. See State v. Hartsfield, 629 S.W.2d 907, 908 (Tenn. Crim. App. 1980); State v. Gawlas, 614 S.W.2d 74, 75 (Tenn. Crim. App. 1980).

We acknowledge, as the defendant also notes, this court had previously denied his interlocutory appeal regarding many of the grounds he raises, stating that the defendant could raise them in this appeal as of right by the state. However, upon further consideration, we believe that the nature of this appeal does not lend itself to consideration of the defendant's issues that are unrelated to the issues raised by the state.

## CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE