IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2007

**STATE OF TENNESSEE v. KAMIKO T. CLARK**

**Appeal as of Right from the Criminal Court for Davidson County**
**No. 2005-A-122   Steve R. Dozier, Judge**

---

**No. M2006-00819-CCA-R3-CD - Filed June 8, 2007**

---

A Davidson County jury convicted the Defendant, Kamiko T. Clark, of six counts of child abuse, a class A misdemeanor.  On appeal, the Defendant alleges that the trial court erred when it: (1) allowed her statement to the police into evidence; (2) refused to merge her three child abuse convictions for each victim into one conviction for each victim; and (3) imposed sentences that were consecutive and involved partial confinement.  Following review, the judgments of conviction are affirmed.  However, because the trial court failed to make findings of fact with regard to consecutive sentencing, we remand the case to the trial court for a determination of whether consecutive sentencing is warranted in this case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**
**and Remanded for Determination of Consecutive Sentencing**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Emma Rae Tennent, Assistant Public Defender, Nashville, Tennessee (on appeal), and Amy Harwell and Dawn Deaner, Assistant Public Defenders, Nashville, Tennessee (at trial), for the Appellant, Kamiko T. Clark.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Amy Eisenbeck, Rachel Sobrero, and Matt Stephens, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**
**I.  Facts**

This case arises from the Defendant's indictments for seven counts of aggravated child abuse and convictions for the lesser-included offenses of child abuse.  At her trial on these charges, the following evidence was presented:

Brandon Myrtle, a school counselor at Cumberland Elementary School, testified that she took T.C.[1], the Defendant's son, to the school clinic and that blood oozed from injuries to his leg, his head, and the bottom of his foot. Myrtle told T.C. that she needed to tell other individuals about the things he had told her, and she called the Department of Children's Services ("DCS").

Detective Robert Carrigan testified that he visited and photographed T.C. at school because the social worker from DCS was tied up in an emergency. He noted that T.C. had extensive injuries and said that T.C.'s sister had similar injuries. He described how, at the Defendant's residence, Maryam Abdullah, the DCS case-worker, photographed M.M.[2], the Defendant's daughter, and then immediately provided Detective Carrigan with these photographs. Photographs of both victims were entered into evidence and Detective Carrigan then described the injuries that they depicted.

Detective Carrigan described how he recorded a conversation that he had with the Defendant at her residence, and this recording was played before the jury. During this tape recording, the Defendant described how she "whipped" T.C. and M.M. The Defendant stated that she first "whipped" M.M. with a leather belt, and M.M. snatched the belt away. The Defendant then got a broom and hit M.M. once or twice with a broom on her arm and her legs, and the broom broke on M.M.'s legs. Next, the Defendant "whipped" T.C. with the belt and with the belt buckle. The Defendant stated that she "picked up the broom for T.C.," but "didn't do nothing" [sic] with the broom. When asked about using an extension cord to hit T.C., the Defendant denied using an extension cord and went and retrieved the cord that she actually used. Detective Carrigan asked her how many times she "whipped" T.C. with the cord, and the Defendant responded that she could not recall. The Defendant testified that her mother whipped her with an extension cord when she was a child.

Tracey Bowden, the Defendant's sister, testified that she visits the Defendant's home every other day to help with household matters because her sister is "slow." Bowden explained that her sister has difficulty understanding what people say to her and, consequently, gets agitated or defensive. She testified that their mother beat them with extension cords, lamps, and any other item within their mother's reach.

Based upon this evidence, the jury found the Defendant guilty of seven counts of child abuse, as lesser-included offenses of the indicted charges of aggravated child abuse.

## II. Analysis

On appeal, the Defendant alleges that the trial court erred when it: (1) allowed the her

---

[1] It is this Court's policy to use the initials of minor children involved in child abuse cases to protect their privacy.

[2] The record provides two different names for the Defendant's daughter, and this Court is using the name provided in the indictment.

statement to the police into evidence; (2) refused to merge her three child abuse convictions for each victim into one conviction for each victim; and (3) imposed sentences that were consecutive and involved partial confinement.

## A. The Defendant's Statement to Police

The Defendant contends that the trial court erred when it admitted into evidence her statements obtained during her conversation with Detective Carrigan. Specifically, she asserts that she invoked her right to remain silent, Detective Carrrigan failed to honor her invocation, and that the record does not reflect that she voluntarily, knowingly, and intelligently waived her right to remain silent. Therefore, she contends that her statement, and the belt, belt buckle, and cord discovered pursuant thereto, should be suppressed. The State contends that the trial court properly found that, when the Defendant gave statements to the police, she had knowingly, voluntarily, and intelligently waived her *Miranda* Rights.

When this Court reviews a trial court's findings of fact on suppression issues, questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The trial court's determination at a suppression hearing is presumptively correct on appeal. *State v. Saylor*, 117 S.W.3d 239, 244 (Tenn. 2003). This determination is binding unless the evidence in the record preponderates against the finding's of the trial court. *Daniel*, 12 S.W.3d at 423. The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. *State v. Huskey*, 177 S.W.3d 868, 877 (Tenn. Crim. App. 2005)

The Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." *Miranda v. Arizona* bars the admission of any statements elicited from a defendant through police initiated custodial interrogation unless the defendant, prior to making the statement, was warned of certain constitutional rights and knowingly waived those rights. 384 U.S. 436, 444 (1966). These procedural safeguards require that police officers must advise a defendant of his or her right to remain silent and of his or her right to counsel before they may initiate custodial interrogation. *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005). If these warnings are not given, statements elicited from the individual may not be admitted into evidence. *Id.* If the suspect indicates in any manner that he wishes to remain silent, custodial interrogation must cease. *Huskey*, 177 S.W.3d at 878.

To determine whether an individual is "in custody," this Court must consider whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest. *State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001). Interrogation "refers not only to express

questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005) (quoting *Rhode Island v. Ignis*, 446 U.S. 291, 301 (1980)). Interrogation also includes any "practice that the police should know is likely to evoke an incriminating response from a suspect." *Sawyer*, 156 S.W.3d at 534. The disclosure of incriminating evidence does not necessarily constitute interrogation in violation of *Miranda*. *Id.* at 535.

      *Miranda* warnings may be waived by an accused. *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000). The test for voluntariness for confessions under Article 1, section 9 of the Tennessee Constitution is broader and more protective of individual rights that the test of voluntariness under the Fifth Amendment. *Huskey*, 177 S.W.3d at 878. In order to introduce a defendant's confession into evidence at the trial of the matter, the burden rests upon the State to demonstrate a valid waiver by a preponderance of the evidence. *Huskey*, 177 S.W.3d at 878.

A valid waiver cannot be established by showing only that a defendant responded to further police initiated custodial interrogation even if the defendant has been advised of his rights. *Huskey*, 177 S.W.3d at 878. If a suspect indicates in any manner that he wishes to remain silent, custodial interrogation must cease. *Id.* After a suspect invokes his right to remain silent, police may not resume custodial interrogation unless the defendant's right to "cut off questioning" was "scrupulously honored." *Id.* If a police officer fails "'to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind,' a constitutional violation would occur." *Id.* (quoting *Michigan v. Mosley*, 423 U.S. 96 (1975)).

The record reflects that the following incidents occurred during Detective Carrigan's initial conversation with the Defendant:

When Detective Carrigan arrived at the Defendant's home, he saw Abdullah, a DCS case worker, and Detective Gibson speaking with the Defendant outside her home. Detective Carrigan approached the Defendant and asked if everyone could enter her home and have a private discussion. The Defendant unlocked her front door and everyone proceeded into the Defendant's living room.

Immediately after everyone entered the Defendant's home, she asked them, "seriously, what are you looking for? I didn't really invite you all in." The Defendant then stated that she had the right not to let the detectives and Abdullah into her house. Detective Carrigan then provided the Defendant with *Miranda* warnings in a firm tone. After Detective Carrigan finished explaining that the Defendant had a right to an attorney and that one would be appointed to represent her if she could not afford one, the Defendant stated, "I guess I'll run my ass silent." Detective Carrigan responded, "Okay, that works for me." The Defendant then stated, "[G]o ahead and talk." Detective Carrigan responded, "Okay, here's the deal," and he began to describe the evidence that he had collected against the Defendant. Detective Carrigan told the Defendant that he went to T.C.'s school, looked at T.C.'s injuries, and T.C. said that the Defendant had beat him with an extension cord. The

Defendant interrupted and said, "No, it was just a belt." Detective Carrigan testified that he intended to place the Defendant under arrest when he went to her home. He said that he began to explain the nature of the allegations against the Defendant after she said, "go ahead and talk."

After he described the allegations against the Defendant and she responded, Detective Carrigan began to question the Defendant, and the Defendant proceeded to describe how she "whipped" two of her children. After Detective Carrigan spoke with the Defendant for approximately forty minutes, he completed his entire review of the *Miranda* Rights Waiver Form, and the Defendant signed a *Miranda* Rights Waiver Form and a Consent to Search Form. Detective Carrigan acknowledged that the Defendant made substantial admissions to him before she signed the *Miranda* Rights Waiver Form. A psychological assessment performed on the Defendant revealed that her IQ, as measured after her interrogation, was in the "borderline intellectual functioning" range. Detective Carrigan acknowledged that the Defendant indicated that she had a tenth grade education. The trial court found that:

> The [D]efendant's argument in sum is that Detective Carrigan's statement, "That works for me," when the defendant initially invoked her right to remain silent was calculated to get a response. Thus, in the defendant's opinion, the statements elicited from her were the result of coercion and that she did not understand the results of her actions. However, the Court has reviewed the audiotape and is of the opinion, based upon the totality of the circumstances, that the choice to speak was uncoerced and that the defendant understood the consequences of her decision. There is not, in the Court's opinion, a more rational position to take but that she chose to waive those rights voluntarily, knowingly, and intelligently. Detective Carrigan's statement, "That works for me," based upon an objective standard, was made to honor the defendant's request . . . not to receive a response. Immediately following this statement, paper can be heard rustling as the detective prepares to leave. The fact that she invoked her rights prior to waiving it establishes even further that she was indeed well aware of the constitutional protections afforded her and that she desired to waive them upon speaking to the detective. Therefore, whatever admission the State seeks to introduce in any potential trial are in fact admissible since they were not the result of a <u>Miranda</u> violation.

In the case under submission, the evidence in the record does not preponderate against the findings of the trial court. First, we note that the trial court did not specifically address whether the Defendant was in custody for *Miranda* purposes. The Defendant contends, and we agree, that she was, in fact, in custody. Detective Carrigan testified that he intended to take the Defendant to jail from the moment he arrived at her home in possession of a warrant for her arrest. When the Defendant indicated that she did not want the detectives in her home, Detective Carrigan provided the Defendant with *Miranda* warnings in a firm tone and a discussion about the allegations against her ensued. Viewing this matter in the totality of circumstances, we conclude that a reasonable person in the Defendant's position would have considered himself or herself deprived of freedom of movement to a degree associated with formal arrest. We also note that the Defendant clearly

invoked her fifth amendment right to remain silent when she stated, "I guess I'll run my ass silent."

The record reflects that the Defendant received her Miranda warnings, invoked her right to remain silent, and then told Detective Carrigan to "go ahead and talk." The Defendant contends that Detective Carrigan did not consider her telling him to "go ahead and talk" as a renunciation of her right to remain silent. In our view, Detective Carrigan did not fail to scrupulously honor the Defendant's invocation of her right to remain silent when he proceeded to describe the nature of the allegations against her after she told him, "go ahead and talk." It is evident from the record that the Defendant's statements were voluntarily made after Detective Carrigan continued speaking with the Defendant, as the Defendant had requested. The Defendant simultaneously interrupted Detective Carrigan as he described the allegations against her to explain that she did not whip T.C. with an extension cord. The Defendant's further statements were made during the course of an extended conversation with Detective Carrigan. The record reflects that the Defendant's choice to speak was uncoerced and that the Defendant understood the consequences of her decision. We conclude that the Defendant knowingly, voluntarily, and intelligently waived her Miranda rights, and, therefore is not entitled to relief on this issue.

## B. Failure to Merge Convictions

The Defendant contends that the trial court erred when it failed to merge the Defendant's three child abuse convictions for each victim. The State contends that the trial court's imposition of separate sentences was proper.

All the Defendant's charges arose from the same statute, Tennessee Code Annotated section 39-15-402 (2003). Counts one through three of the indictment charged the Defendant with knowingly, and other than by accidental means, treating [T.C.] in such a manner as to inflict injury, and a deadly weapon was used to accomplish the act of abuse. Each count alleged the use of a different instrument: count one alleged the use of a belt buckle; count two alleged the use of a broom; and count three alleged the use of an extension cord. Count four alleged that the Defendant did knowingly, other than by accidental means, treat [T.C] in such a manner as to inflict injury, and the act of abuse resulted in serious bodily injury. Counts five through seven of the indictment charged the Defendant with knowingly, and other than by accidental means, treating [M.M.] in such a manner as to inflict injury, and a deadly weapon was used to accomplish the act of abuse. Each count alleged the use of a different instrument: count five alleged the use of a belt buckle; count six alleged the use of a broom; and count seven alleged the use of an extension cord.

At the end of the trial, the Defendant asked for a judgment of acquittal alleging that the State failed to prove which instruments caused the children's injuries, thereby failing to prove that the Defendant had indeed used each instrument to beat her children as alleged in the indictment. The trial court denied the Defendant's motion and stated:

I might add, too, on the - - not that it affects the Judgment of Acquittal - - but, I mean, at some point, if the Jury credits the State's testimony - - and, obviously,

that's up to them - - it more than likely will be merger issues, that would need to be dealt with, if there are multiple convictions.

So, as I've stated earlier, I don't know that the State has to show which injury was caused by which instrumentality; but I don't know either that multiple convictions would stand on one alleged victim.

When sentencing the Defendant, the trial court merged count four and noted that: "In terms of merger, as I've noted and the State concedes, Count Four would merge with Counts One, Two, and Three, in terms of the same victim, [T.C.], under alternative theor[ies] of serious bodily injury versus there being a deadly weapon." The trial court stated the following in regards to merging the Defendant's other convictions:

I do think there's a basis for allowing them to stand and not merge, based on the time frame, time span decision or conscious decision to switch instruments because one wasn't working - - and some of this is contained within the Defendant's statement to the detectives . . . .

I mean, there is a - - a break, minimal, at least, by which each of these instruments are being used on the two, minor children.

Merger has been applied to convictions to remedy a double jeopardy problem relative to multiple punishment. *State v. Beard*, 818 S.W.2d 376, 379 (Tenn. Crim. App. 1991). Because it is a question of law, this Court's review of a double jeopardy issue is de novo with no presumption of correctness. *State v. Lewis*, 958 S.W.2d 736, 738 (Tenn. 1997). The double jeopardy clause in the United States Constitution provides that no person "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . ." U.S. Const. amend V. Similarly, the Tennessee Constitution states that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Three fundamental principles underlie double jeopardy: (1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense. *State v. Burris*, 40 S.W.3d 520, 524 (Tenn. Crim. App. 2000).

The instant case falls into the third category, multiple punishments for the same offense. When multiple sentences are imposed in a single trial, double jeopardy protection "is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977). Prosecutors cannot avoid the limitations of the double jeopardy clause by the simple expedient of dividing a single crime into a series of temporal or spatial units. *State v. Easterly*, 77 S.W.3d 226, 232 (Tenn. Crim. App. 2000). "Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense." *State v. Charles L. Williams*, No. M2005-00836-CCA-R3-CD, 2006 WL 3431920, at *29 (Tenn. Crim. App., at Nashville, Nov. 29, 2006) (quoting *State v. Phillips*,

924 S.W.2d 662, 665 (Tenn. 1996)). Whether the acts of a defendant constitute separate offenses or one single crime must be determined by the facts and circumstances of each case. *State v. Pickett*, 211 S.W.3d 696, 706 (Tenn. 2007).

To determine whether several offenses have been created out of a single offense for double jeopardy purposes, several general principles must be considered: (1) a single offense may not be divided into separate parts and, generally, a single wrongful act may not furnish the basis for more than one criminal prosecution; (2) if each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and (3) where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act. *State v. Epps*, 989 S.W.2d 742, 745 (Tenn. 1998). Additional factors such as the nature of the act, the time elapsed between the alleged conduct, the intent of the accused and whether new intent was formed, and cumulative punishment may be considered for guidance in determining whether the multiple convictions violate double jeopardy. *Pickett*, 211 S.W.3d at 706. All the Defendant's charges arose from the same statute, Tennessee Code Annotated section 39-15-402, which states in pertinent part that any person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare is guilty of abuse or neglect. The question is whether the Defendant's actions with regard to each child constituted a single offense or three separate offenses under the child abuse statute.

In the case under submission, the Defendant committed a separate offense each time she used a different instrument to whip T.C. and M.M. Because the Defendant took the time to put down a weapon and pick up another, in abusing her children, the trial court's imposition of separate sentences was proper. Therefore, the trial court properly refused to merge the three counts of child abuse for each victim.

## C. Sentencing

The Defendant contends that the trial court erred when it sentenced her to serve thirty days in confinement rather than sentencing her to full probation, imposing a partial sentence of split confinement, and erred when it imposed consecutive sentences. The State contends that the record supports the Defendant's sentence.

The following evidence was presented at the Defendant's sentencing hearing: Maryann Abdallah testified that she serves as a liaison between DCS and Juvenile Court. She explained that she monitored the Defendant's juvenile court proceedings, which arose from the same abuse allegations in the instant case. The Defendant's proceedings in juvenile court lasted approximately eight months, during which time, the Defendant was required to participate in parenting classes and in-home counseling. Abdullah testified that the Defendant complied with all aspects of the juvenile court's requirements. In order to comply with the juvenile court's requirements, the Defendant was never alone with her children, and her cousin, Sunny Reed, stayed with her family during the day and her sister, Bowden, stayed with the Defendant's family during the night.

-8-

Bowden testified that she visits the Defendant and Defendant's children every day, that she assists the Defendant in running her household, and that has a close relationship with the Defendant's children. Bowden has helped the Defendant develop alternatives to corporal punishment and checks the children periodically to ensure that they have not received any corporal punishment. Bowden agreed that the Defendant underwent a psychological evaluation that determined that she has low intellectual functioning. Bowden testified that the Defendant sounded defensive in the recording of her conversation with Detective Carrigan because the Defendant was responding to the tactics that Detective Carrigan employed and that the Defendant now regrets her actions.

The trial court made the following statement when it imposed the Defendant's sentence:

> There's no question in the Court's mind . . . [the discipline] went way beyond what any discipline should've gone and was excessive and, obviously uncalled for.
>
> And I say that, realizing and understanding . . . [t]his classification of [The Defendant] being slow, the word her sister's used and has been used and is even, I believe used in this letter, that she has borderline range of intelligence, in terms of IQ tests, *et cetera*.
>
> I've not heard from [the Defendant] and cannot judge her demeanor and credibility, other than just visually, other than on tape. And, . . . [h]er attitude on the tape was troubling . . . . [S]he's making statements to the effect of, "I whipped them both until I was tired. Tried to use the broom; the broom didn't work. T.C. didn't get what he normally gets. Normally have to whip him every day. It wasn't an extension cord; it was a play station cord."
> [I]t's apparent that she – at least, at the time; I don't know about today - - but, at the time of this event, didn't really think much of it.
>
> And I noted here, "made the statement, 'It isn't that bad,'" and that her kids get their buttocks - - I'll use that word - - whipped. And I mean, to her, it wasn't any big to-do.
>
> But slow or not slow, I think - - and, hopefully, here today she realizes - - that was wrong and uncalled for.
>
> So based on the proof, the Court will impose an eleven-month-and-twenty-nine-day senentece in each count, One, Two, and Three, Five, Six, and Seven, at seventy percent, suspend those, make the groups - - suspend part of those - - make the groups, One, Two, Three, run consecutive to Five, Six, and Seven, for an effective two, eleven-month-and-twenty-nine-day sentences, so that she can be on probation for two years or can be some potential threat over her head for that period of time, allow the kids to grow up a little bit more during that probationary period,

so, maybe, they can - - protect themselves, maybe . . . .

I think the kids need to know that this was wrong, and I think they do know it was wrong. Obviously, they don't want their mother to go to jail; but they're not the ones making the decision.

But I don't think eight days was enough, and I'm sure the State doesn't think that thirty's enough. But that split confinement is intended to let Miss Clark know - - hopefully, listening here today - - that that type corporal punishment - - which there shouldn't be any during the course of that two-year period - - hopefully, according to her sister, there's not been any corporal punishment since DCS' involvement - - but so that Miss Clark knows that jail time is over her head, so that, if there [a]re any problems that [a]re noted - - school or DCS - - that she will for the next two years be subject to those two eleven-twenty-nines.

The Defendant was convicted of six counts of child abuse, a Class A misdemeanor. The trial court ordered that all of the Defendant's child abuse convictions based on the abuse that T.C. received, counts one through three, run concurrently with one another for a total sentence of eleven months and twenty-nine days of probation at seventy percent with thirty days of incarceration to be served on weekends. For counts five through seven, the child abuse convictions based on the abuse that M.M. received, the trial court ordered the Defendant's convictions to run concurrently with one another for a total sentence of eleven months and twenty-nine days of probation at seventy percent and consecutively to her convictions for counts one through three.

## A. Probation

The Defendant contends that the trial court erred when it failed to order her entire sentence to be served on probation. Specifically, she asserts that the trial court failed to consider the proper mitigating factors. The State contends that the trial court properly sentenced the Defendant to serve a sentence of split confinement.

In misdemeanor sentencing, the sentence imposed must be specific and consistent with the purposes and principles of the Criminal Sentencing Reform Act of 1989. T.C.A. § 40-35-302(b) (2003). A percentage of not greater than seventy-five percent of the sentence should be fixed for service, after which the Defendant becomes eligible for "work release, furlough, trusty status and related rehabilitative programs." T.C.A. § 40-35-302(d). In this case, the trial court set the Defendant's percentage for service at seventy percent.

The misdemeanant, unlike the felon, is not entitled to the presumption of a minimum sentence. State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994). However, in determining the percentage of the sentence to be served in actual confinement, the trial court must consider enhancement and mitigating factors, as well as the purposes and principles of the Criminal

Sentencing Reform Act of 1989, and the court should not impose such percentages arbitrarily. T.C.A. § 40-35-302(d). Our Supreme Court has observed that "[i]n addition to the statutory considerations for issuing sentences of confinement, the misdemeanor sentencing statute merely requires a trial judge to consider enhancement and mitigating factors when calculating the percentage of a misdemeanor sentence to be served in confinement." *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998). This Court has stated:

> In felony sentencing, the trial court has an affirmative duty to state in the record, either orally or in writing, which enhancement and mitigating factors it found and its findings of fact. Tenn. Code Ann. § 40-35-209(c) (1997); Tenn. Code Ann. § 40-35-210(f) (Supp.1998); *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn.1998). In contrast, the misdemeanor sentencing statute only requires that the trial court *consider* the enhancement and mitigating factors when calculating the percentage of the sentence to be served in actual confinement" prior to "consideration for work release, furlough, trusty status and related rehabilitative programs." Tenn. Code Ann. §§ 40-35-302(d) (1997); *Troutman*, 979 S.W.2d at 274.

*State v. Russell*, 10 S.W.3d 270, 278 (Tenn. Crim. App. 1999). Our statutory system concerning misdemeanor sentencing is designed to provide trial courts with continuing jurisdiction and a great deal of flexibility. *See* T.C.A. § 40-35-302(d), Sentencing Comm'n Cmts.; *State v. Boyd*, 925 S.W.2d 237, 244 (Tenn. Crim. App. 1995).

In the case under submission, the trial court clearly sentenced the Defendant with due consideration to the principles of the sentencing act. As previously stated, in misdemeanor sentencing, the trial court need not articulate in the record which enhancement and mitigating factors it finds applicable; rather, it need only consider them. The trial court indicated that the Defendant displayed a disturbing attitude and exhibited no remorse for her behavior. These factors fully justify the trial court's decision to order the Defendant to serve thirty days in confinement rather than sentencing her to full probation. Further, we conclude that the lack of other findings is no basis for holding the trial court in error. *See Russell*, 10 S.W.3d at 278. The Defendant has failed to establish that any aspect of her sentence constituted an abuse of the trial court's substantial discretion in sentencing her for her misdemeanor conviction, and the Defendant is not entitled to relief on this issue.

### B. Consecutive Sentences

The Defendant contends the trial court failed to place findings on the record to support the imposition of consecutive sentencing. At the sentencing hearing the trial court imposed consecutive sentences without setting forth specific factors to explain the imposition of consecutive sentences. The trial court made the following statement when it imposed consecutive sentences:

> And, other than an attorney general's opinion – which I don't have to follow one way or the other – there's nothing I find that makes me find some category under Forty-

thirty-five-one-fifteen, in terms of multiple convictions, that requires the Court to make one of those findings prior to imposing consecutive sentences on a misdemeanor.

A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. *See State v. John Sterling Lewis*, No. M2004-02450-CCA-R3-CD, 2006 WL 1816317, at *8 (Tenn. Crim. App., at Nashville, Mar. 14, 2006) (holding that the trial court failed to address the necessary sentencing considerations required by statute when it did not find any of the section 40-35-115 factors necessary to impose consecutive sentencing), *perm. app. denied* (Tenn. June 28, 2006); *State v. Charles Henry George*, No. 01C01-9512-CC-00407, 1997 WL 110007, at *4 (Tenn. Crim. App., at Nashville, Mar. 13, 1997) (modifying the Defendant's sentences to run concurrently after finding that the record did not justify concurrent sentencing), *perm. app. denied* (Tenn. Dec. 29, 1997). Rule 32(c)(2) of the Tennessee Rules of Criminal Procedure specifically states that the "judgment to make the sentences consecutive or concurrent shall explicitly recite the judge's reasons therefor, and is reviewable on appeal."

In the case under submission, we agree that the trial court did not specifically find that any of the section 40-35-114 factors necessary to impose consecutive sentencing existed. Thus, review of the record does not support a finding that the trial court addressed the necessary sentencing considerations as required by statute. The purpose of recording the court's reasoning with regard to imposition of a sentence is to guarantee the preparation of a proper record for appellate review. *State v. Ervin*, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996). The absence of findings serves to preclude our statutorily mandated de novo review of the consecutive sentences. Accordingly, remand is necessary in this case.

### III. Conclusion

Based upon the aforementioned reasoning and authorities, we affirm the Defendant's convictions. However, the imposition of consecutive sentencing is vacated, and the case is remanded to the trial court for determination of whether consecutive sentencing is appropriate and entry of findings of fact supporting that determination.

_____
ROBERT W. WEDEMEYER, JUDGE