# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 28, 2010 Session

## CLARENCE DAVID SCHREANE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
No. 264982    Rebecca J. Stern, Judge

---

**No. E2009-01103-CCA-R3-PC - Filed October 7, 2010**

---

The Petitioner, Clarence David Schreane, appeals the Hamilton County Criminal Court's denial of post-conviction relief from his convictions for first degree felony murder and especially aggravated robbery. On appeal, he contends that trial counsel rendered ineffective assistance by (1) not seeking dismissal of the Petitioner's indictment on due process grounds, (2) not seeking dismissal of the Petitioner's indictment under the Interstate Compact on Detainers, and (3) not seeking suppression of the Petitioner's statement to police on the basis that he was denied the right to counsel. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and J.C. MCLIN, JJ., joined.

Jason D. Demastus, Chattanooga, Tennessee (on appeal), and David W. Schmidt, Signal Mountain, Tennessee (at trial), for the appellant, Clarence D. Schreane.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; William H. Cox, III, District Attorney General; and William H. Hall, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Petitioner was convicted of first degree felony murder and especially aggravated robbery and sentenced to life imprisonment for the murder and sixty years' confinement for the robbery, to be served consecutively for an effective sentence of life plus sixty years. This court affirmed the judgments of the trial court and recited the facts of this case in State of

This case relates to the defendant's participation in the killing of Marcus Edwards on September 19, 1991. The Chattanooga Police Department investigated the murder; however, the case went cold and remained unsolved for eight years. In 1999, the defendant was incarcerated on unrelated charges when he contacted Chattanooga Police Department detectives and told them he had information related to the unsolved 1991 murder. The detectives had the defendant brought to their location to speak with him, and after a period of a few hours, the defendant confessed.

At the trial, the evidence showed that the defendant accompanied Charles Turner to the victim's place of business to help Mr. Turner commit a robbery. As the victim was talking to Mr. Turner, the defendant struck the victim with a rock, and Mr. Turner then shot the victim with a .38 caliber handgun. Mr. Turner took the victim's .357 magnum handgun, which was on the victim's body. Mr. Turner also took a cigar box containing cash and gave the defendant one hundred dollars as both men fled the scene in the defendant's 1983 Cadillac Eldorado.

Before the trial, the defendant filed a motion to suppress his confession, arguing that it was taken in violation of his Fifth and Fourteenth Amendment rights. At the motion to suppress hearing, Chattanooga Police Department Detective Mike Mathis testified that he was the lead investigator for the 1991 murder. He said the victim was shot to death and found in his business. Detective Mathis said few solid leads developed until the defendant contacted them.

Detective Mathis said that sometime before September 19, 1999, Chattanooga Police Department Lieutenant Steve Angel had been receiving collect telephone calls from the Hamilton County Jail, which he was unable to answer. He said that the defendant's "significant other" contacted the detectives and told them the defendant wanted to talk to them about an

-2-

unsolved murder. He said the defendant also called and spoke with Lt. Angel and told him enough specific information about the murder to cause Lt. Angel to have the defendant transported from the Hamilton County Jail to the police service center.

Detective Mathis said he conducted an interview with the defendant, culminating in a tape-recorded statement. He said that although the defendant was in custody on unrelated charges, he was not under arrest or charged with the victim's murder when he confessed. Detective Mathis said he did not promise the defendant anything in return for his confession. Detective Mathis said the defendant waived his constitutional right to remain silent and to an attorney before making the tape-recorded statement.

On cross-examination, Det. Mathis said he talked with the defendant for some period of time before reading him his Miranda rights. He admitted that before he arrived to interview the defendant, Lt. Angel had been talking to the defendant. Detective Mathis said that although he did not promise the defendant anything specific in return for his confession, he did explain to the defendant that he would tell the district attorney general's office that the defendant had come forward on his own and cooperated with the police. Detective Mathis admitted that he may have told the defendant he would try to help transport the defendant from the Hamilton County Jail to Silverdale, a state correctional facility.

On redirect examination, Det. Mathis said the defendant initiated the contact with the police department. Detective Mathis explained that the reason for the delay in reading the defendant his Miranda rights was the defendant initially maintained that he had only heard about the murder, not that he had any involvement in it. He said the defendant ultimately "came clean" and confessed.

The defendant testified that when he first arrived at the police service center, he was placed in an interview room with Det. Carroll and Det. Mathis. He said Lt. Angel entered the room later. The defendant said Det. Mathis told him he believed

"the bicycle bandit" was responsible for the victim's murder. The defendant said that he then asked to speak with his attorney but that Det. Mathis told him he did not need an attorney. The defendant said Det. Mathis made promises to him before the taping began. He said Det. Mathis promised him that the defendant would not be charged with the murder, that Det. Mathis would speak with the defendant's parole officer in another case, and that Det. Mathis would speak with the district attorney general's office in order to have them dismiss certain charges against the defendant from another case in return for the defendant's cooperation. He said Det. Mathis also promised to transfer him from the Hamilton County Jail to Silverdale. The defendant said he was transferred to Silverdale two days later. The defendant said he did not sign the waiver form until after the taped statement was made.

After considering the evidence and the arguments of counsel, the trial court denied the defendant's motion to suppress. It stated:

> Even on your motion, I can base all of my findings on what Mathis and the statement says. . . . The initial contact came not from the police to [the defendant] but from someone on [the defendant's] behalf and then later by [the defendant] to the police. [The police] would have been derelict in their duty not to see what [the defendant] had to say about it, something like this. So they bring him out there and talk with him.
>
> Now, as far as the requirements for Miranda warnings, you have to be in custody and subject to interrogation. He was in custody but certainly not on this and not by these officers on this. So I don't think that it actually applies in this situation.
>
> The fact that he is in custody on something else doesn't mean for Miranda purposes he wasn't in custody on this.

He also made the initial contact. Certainly they questioned him after he gave them some information but I find from the transcript itself and the conversation between Mr. Mathis at the very beginning of the tape, he says, "Prior to taking this statement I advised you of your constitutional rights and did you understand these." [The defendant] says, "Yes, he did."

Mathis says, "Am I correct in saying that as I started to advise you of them, you basically recited them to me, did you not?" [The defendant] said, "Yes."

Mathis says, "And I mean you read - - told me what your rights were without even looking at that form, you knew your rights, is that correct?" [The defendant] says, "Yes."

Mathis says, "And you have signed this rights waiver agreeing to talk to us today." "Yes." "And that's your signature that I'm pointing to on this rights form." [The defendant] says, "Yes."

It's incredible to believe that the rights waiver got signed after the taped statement when they discuss it prior to even questioning on the tape, so that's totally unbelievable.

. . . .

Now, I don't believe that [the defendant] walked in there, signed the waiver, and started this. I think he had probably been there a while. He probably got there before midnight and had been talking to some of them and talking to them about things and as they decided they had information they needed to use, they read him rights waiver and did the tape. There is really nothing wrong with it. He made a knowing and voluntary

statement to the police. It was not made during the course of negotiations or settlement of this case. He obviously wanted good treatment and was looking out for himself, no doubt about that, that happens all the time. There was nothing improper about this. The motion to suppress the confession is overruled.

At the post-conviction hearing, the Petitioner's trial counsel testified that he had practiced criminal defense for nine years. He said that he conducted three or four trials before the Petitioner's trial but that this was his first murder trial.

Trial counsel agreed that the Petitioner confessed in January 1999 and was arraigned in March 2003. He said that the delay between the confession and the arraignment did not bother him because it was not an unnecessary delay. He said that the police tried to verify the Petitioner's statements during this time and that the police were investigating two suspects, the Petitioner and Charles Edward Turner, and wanted to "be sure they had the right people." Trial counsel also stated that the delay did not bother him because it did not prejudice the Petitioner, there being no loss of evidence or witnesses. He said the Petitioner was already in jail for twenty-five years for a federal conviction and suffered no additional loss of liberty due to the delay. He did not believe that the police delayed to gain a tactical advantage over the Petitioner. Trial counsel said that he and an assistant each spent several hours researching whether the delay violated the Petitioner's due process rights and determined that it did not. As a result, trial counsel did not seek to dismiss the indictment on due process grounds.

Trial counsel testified that both he and the Petitioner researched the Interstate Compact on Detainers. He said that he spoke with the district attorney's office to determine what motions were filed to enable the transfer of the Petitioner between federal and state custody. He also spoke with the head of the federal defender's office to determine if the Compact was violated. He was told that the Compact did not apply because the transfer to state custody was achieved by writ of habeas corpus ad prosequendum rather than by detainer. He said that further research by an assistant confirmed that the Compact was not applicable because all transfers were achieved by writ and not by detainer. He said that he told the Petitioner the Compact did not apply. He said that a later transfer between federal and state custody did not violate the Compact because the trial was held within 120 days of the second transfer.

The Petitioner testified that he first met trial counsel at his arraignment. He said that he and counsel met "maybe twice" before trial. He said he appeared at the Hamilton County trial after being transferred to state custody pursuant to a writ of habeas corpus ad prosequendum.

The Petitioner testified that he spoke with the Chattanooga police but that he "didn't initiate the first call." He said that he met with two detectives and that he told them he wanted an attorney present during the questioning. He said that the detectives responded by stating he did not need an attorney and that they "totally avoided" his request. He said the conversation continued after his request for an attorney.

Chattanooga Police Officer Mike Mathis testified that he met with the Petitioner at the police department. He said that there was no problem informing the Petitioner of his rights and that the Petitioner signed a waiver of his rights. He said the Petitioner did not ask to have an attorney present.

Officer Mathis testified that he "did a lot of things to corroborate" the Petitioner's statement and confession. He said that he had to locate a witness, Phillip Joliff, and that after a lengthy process, he found the witness in Ohio. He said that he investigated the codefendant, Mr. Turner, and that he worked "to get both the subjects that were responsible for this murder." He said he used information obtained from the Petitioner to investigate Mr. Turner because the Petitioner "was cooperating with us and was preparing with us to testify on our behalf against Mr. Turner."

On cross-examination, Officer Mathis testified that the Petitioner initiated the contact with police. He said that the initial conversation with the Petitioner was "not an interview or an interrogation. We're just talking." He said that he felt the Petitioner was guilty of a crime "very early" in the conversation but that he did not immediately charge the Petitioner because "[the Petitioner] was in custody for something else. He wasn't going anywhere. He was cooperating with us."

Officer Mathis testified that the delay between the Petitioner's confession and the indictment was due to efforts to investigate and corroborate the information obtained from the Petitioner. He said that the case was already eight years old and that it took time to locate and interview Mr. Joliff, who was "basically homeless and traveling all over the country." He said that it also took time to arrange a meeting with Mr. Turner, who was in federal custody in Indiana. He said that the investigation "progressively went on and on," and that they did not finish the investigation and then "just sit on it."

With regard to the Petitioner's claim of a due process violation caused by the pre-arraignment delay, the trial court accredited the testimony of Detective Mathis, noting that the delay was caused by the need to corroborate the Petitioner's statements and the need to locate witnesses. However, the court also stated, "whether they account for all or only part of the delay is not clear, the detective not testifying about dates or time." With regard to the Petitioner's statement to police, the trial court found that the evidence introduced at the post-conviction hearing added nothing to the proof previously introduced at the suppression hearing and noted that this court affirmed the result of that suppression hearing on direct appeal.

The burden in a post-conviction proceeding is on the Petitioner to prove his allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006); Dellinger v. State, 279 S.W.3d 282, 294 (Tenn. 2009). Once a petitioner establishes the fact of counsel's errors, the trial court must determine whether those errors resulted in the ineffective assistance of counsel. Dellinger, 279 S.W.3d at 293; see Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within

the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). See Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

**I**

The Petitioner contends that trial counsel rendered ineffective assistance because he did not seek dismissal of the Petitioner's indictment on due process grounds due to delays between the offense in 1991, the Petitioner's statement in 1999, and his arrest in 2003. The State contends that trial counsel was effective because there was not a valid basis for dismissal on such grounds. We agree with the State.

In State v. Dykes, 803 S.W.2d 250, 256 (Tenn. Crim. App. 1990), relying upon United States v. Marion, 404 U.S. 307 (1971), this court stated that "[b]efore an accused is entitled to relief based upon the delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain tactical advantage over or to harass the accused." See State v. Gray, 917 S.W.2d 668, 671 (Tenn. 1996). In State v. Utley, 956 S.W.2d 489, 495 (Tenn. 1997), the supreme court acknowledged the "Marion-Dykes" analysis for cases of delay in charging a defendant.

As a preliminary matter, we note that the Petitioner waived any issue regarding a due process violation caused by the pre-statement delay occurring between the offense in 1991 and the statement given to police in 1999. The Petitioner raises this issue for the first time in this post-conviction appeal. See T.C.A. § 40-30-106(g) ("A ground for relief is waived if the petitioner . . . failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented. . . .").

Trial counsel testified that he and an assistant each spent several hours researching whether the pre-arrest delay, occurring between the Petitioner's statement to police in 1999 and his arrest in 2003, violated the Petitioner's due process rights. They determined that it did not. The Petitioner has not established by clear and convincing evidence that this determination was in error or that dismissal on this ground would have been proper.

The record does not show that the Petitioner was prejudiced because of the pre-arrest delay. The Petitioner did not suffer any additional loss of liberty due to the delay because he was already incarcerated for a federal conviction. Trial counsel said that the delay did not cause a loss of evidence or lack of witnesses. A witness and the codefendant were located during the delay. The record does not indicate that any other evidence or witnesses were available, and the Petitioner has not shown otherwise.

Additionally, the record does not indicate that the State caused the delay in order to harass the Petitioner or gain a tactical advantage over him. Officer Mathis testified that while he believed the Petitioner was guilty of some crime early on in his investigation, the delay between the confession and the indictment was caused by his efforts to investigate and corroborate the information obtained from the Petitioner. He said that the case was already eight years old and that he had to travel to locate a transient witness and the codefendant. He said that his investigation was ongoing and that it was necessary to make certain that both persons responsible for the murder were held accountable. Nothing indicates that the police completed their investigation and then improperly delayed, and the Petitioner has not shown otherwise.

The Petitioner has not established that this delay violated his due process rights. We hold that the Petitioner has not shown that trial counsel's failure to seek dismissal on this ground was deficient or prejudicial.

**II**

The Petitioner contends that trial counsel rendered ineffective assistance by not seeking dismissal of the Petitioner's indictment under the Interstate Compact on Detainers. The Petitioner argues that the trial court was required to dismiss his case pursuant to this Compact because he was transferred between federal and state custody without a trial and because he did not receive a trial within 180 days of the first transfer. The State contends that trial counsel was effective because there was not a valid basis for dismissal on this ground. We agree with the State.

The Interstate Compact on Detainers is an agreement among the states, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States. See Carchman v. Nash,

473 U.S. 716, 719 (1985). Tennessee has adopted the Compact. See T.C.A. § 40-31-101 (2006). Its purpose is to facilitate the speedy and orderly disposition of outstanding charges against a prisoner and the "determination of the proper status of any and all detainers based on untried indictments, informations or complaints." Id. § 40-31-101, art. I. "The provisions of the Agreement are triggered only when a 'detainer' is filed with the custodial or sending state, which includes the United States, by another state which has untried charges pending against the prisoner." State v. Brown, 53 S.W.3d 264, 285 (Tenn. Crim. App. 2000) (citing United States v. Mauro, 436 U.S. 340, 343 (1978)). "The United States Supreme Court has explicitly held that a writ of habeas corpus ad prosequendum, 'directing the production of a . . . prisoner for trial on criminal charges, is not a detainer within the meaning of the Agreement and thus does not trigger the application of the Agreement.'" Brown, 53 S.W.3d at 285 (quoting Mauro, 436 U.S. at 349).

Once a detainer is filed, article III of the Compact requires that a prisoner be transferred to the receiving state and that a trial be held within 180 days. T.C.A. § 40-31-101, art. III(a). Additionally, once a detainer is filed and a prisoner is transferred to the receiving state, article IV(e) of the Compact provides, "If trial is not had on any indictment, information or complaint . . . prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." Id. § 40-31-101, art. IV(e).

Trial counsel testified that he spoke with the head of the federal defender's office to determine if the Compact was violated and that he was told the Compact did not apply because the transfer to state court was achieved by writ of habeas corpus ad prosequendum. He said that further research confirmed that the Compact was not applicable because the transfer was achieved by writ and not by detainer. The Petitioner has not established by clear and convincing evidence that this determination was in error or that dismissal on this ground would have been proper.

The record shows that the Petitioner's transfers between federal and state custody were done pursuant to writs of habeas corpus ad prosequendum and not by detainers. These writs did not qualify as detainers under the Compact and did not trigger its protections. See Brown, 53 S.W.3d at 285; Mauro, 436 U.S. at 349. Despite this, the Petitioner argues that these writs should have been treated as the functional equivalent of detainers because the State could have filed a detainer to obtain custody. However, this court has recognized that the Compact "'is not the exclusive means of transfer of prisoners between jurisdictions.'" Brown, 53 S.W.3d at 285 (quoting Metheny v. State, 589 S.W.2d 943, 945 (Tenn. Crim. App. 1979)). As a result, the state was not required to transfer the prisoner pursuant to the Compact.

The Petitioner has not established that the Compact was applicable to his custodial transfers. We hold that the Petitioner has not shown that trial counsel's failure to seek dismissal on this ground was deficient or prejudicial.

## III

The Petitioner contends that trial counsel rendered ineffective assistance by not seeking suppression of his statement to police on the basis that he was denied the right to counsel. The State contends that trial counsel was effective because the Petitioner was not subject to custodial interrogation when he requested an attorney and therefore his statement could not be suppressed on these grounds. We agree with the State.

A defendant's statements made during a custodial police interrogation are only admissible if the state establishes that the defendant was advised of certain constitutional rights, including the right to an attorney and the right to be silent. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Once a suspect subject to custodial interrogation makes an unequivocal request for an attorney, all interrogation must cease unless the suspect initiates conversation with the police. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); State v. Stephenson, 878 S.W.2d 530, 545 (Tenn. 1994).

Miranda warnings are not required in the absence of custodial interrogation. State v. Northern, 262 S.W.3d 741, 749 (Tenn. 2008) (citing Miranda, 384 U.S. at 478). In Miranda, the Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. However, "questioning initiated by the accused is not interrogation" for the purposes of Miranda protections. State v. Land, 34 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (citing Edwards, 451 U.S. at 484). "The Fifth Amendment right identified in Miranda is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would [be] no infringement of the [invoked] right [to counsel]." Edwards, 451 U.S. at 485-86; see also State v. Huskey, 177 S.W.3d 868, 881 (Tenn. Crim. App. 2005).

This court previously concluded that "the record does not reflect that the [Petitioner] was under custodial interrogation before the police read him the Miranda warnings and obtained his waiver of rights." Clarence David Schreane, slip op. at 5. The record reflects that the Petitioner initiated the questioning in this case by voluntarily seeking out the detectives and speaking to them concerning the victim's murder. As a result, the Petitioner was not subject to custodial interrogation when he initiated communication with the detectives. See Land, 34 S.W.3d at 524. The Petitioner testified that he requested counsel at the beginning of his conversation with the detectives, before any custodial interrogation

began. Absent custodial interrogation, however, the Petitioner's right to counsel was not infringed. See Edwards, 451 U.S. at 485-86; Huskey, 177 S.W.3d at 881. Additionally, any statement the Petitioner made during subsequent custodial interrogation did not violate his right to counsel because he waived that right before any custodial interrogation began. As a result, the Petitioner's right to counsel was not violated when he spoke to the detectives.

The Petitioner has not established a violation of his right to counsel or that suppression of his statement on this ground would be proper. We hold that the Petitioner has not shown that trial counsel's failure to seek suppression of his statement on this ground was deficient or prejudicial.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE